674 So.2d 1018 (1996)
STATE of Louisiana, Appellee,
v.
Garland Wayne WHITE, Appellant.
No. 28095-KA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1996.
*1021 Geary S. Aycock, West Monroe, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, J. Michael Ruddick, Asst. District Attorney, for Appellee.
Before MARVIN, GASKINS and CARAWAY, JJ.
GASKINS, Judge.
The defendant, Garland Wayne White, appeals from his conviction for the offense of aggravated burglary, his adjudication as a habitual offender, and his sentence of 30 years at hard labor. For the reasons set forth below, we affirm.

FACTS
During the early morning hours of May 16, 1993, Johnna Caskey left John Croft's apartment with the intention of driving home. Because it was late and because she lived a considerable distance from Mr. Croft's apartment, Ms. Caskey stopped to call a friend to ask if she could spend the night at her home. Ms. Caskey called her friend from the pay phone located outside the Budget Saver in West Monroe, Louisiana but was unable to contact her.
After Ms. Caskey hung up the telephone, a white car drove into the parking lot. A man, wearing blue jeans, grey t-shirt, and sunglasses, got out and approached her. Without speaking, the man hit Ms. Caskey in the face and tried to drag her to his vehicle. Ms. Caskey screamed, struggled with her assailant, and urinated on herself. During the struggle, Ms. Caskey and the attacker fell to the ground. When Ms. Caskey begged the attacker to let her go, he placed his hand over her mouth and told her she would not be hurt if she quit screaming.
When Ms. Caskey continued to struggle, the attacker momentarily released her. Ms. *1022 Caskey immediately fled to her car; however, the attacker came after her again before she could close and lock the door. The assailant then punched Ms. Caskey in the stomach, pushed her down across the front seats, and tried to get on top of her. While leaning against her, the attacker placed his hand inside her shirt and touched her breast. During the attack, Ms. Caskey continued to scream and begged her attacker to let her go. The assailant responded that he would not hurt her if she stopped screaming and that he wanted to touch her. When the attacker stood up, Ms. Caskey closed and locked her door. As she drove from the parking lot, she memorized the license plate number on the white Buick Regal that the assailant was driving.
Ms. Caskey returned to Mr. Croft's apartment. Mr. Croft described Ms. Caskey as hysterical. He testified she was crying, her face was bleeding, her hair was messed up, and she had urinated on herself. Mr. Croft also stated Ms. Caskey was repeating a number and begging him to write it down. Patricia Simmons, who was present at Mr. Croft's apartment when Ms. Caskey returned, also testified Ms. Caskey had blood on her face and had urinated on herself. Ms. Simmons stated Ms. Caskey was panicked and kept repeating a number and asking them to write it down. Ms. Simmons wrote down the number as requested.
Harold Freeman, a patrolman for the West Monroe Police Department, was dispatched to the Croft apartment to investigate a reported attack. Officer Freeman testified Ms. Caskey had blood around her nose and mouth and was crying and upset. Ms. Caskey described her attacker as a 30 to 40 year old white male, 5'6" to 5'8", and 140 to 160 pounds with dark sandy hair, wearing dark sunglasses and a grey muscle shirt. Ms. Caskey also told police her attacker was driving a white Buick Regal with license plate number ADX 886.
After police determined the white Buick Regal was registered to the defendant, Detective Brent Chappel drove to his residence and asked the defendant's mother and stepfather to have the defendant call him. Later that day, the defendant called Detective Chappel and agreed to come to the police station after running several errands.
Shortly thereafter, Captain Jerry Hayden of the West Monroe Police Department stopped a red Ford truck for failing to yield at an intersection. When the driver of the truck produced a driver's license bearing the name Garland White, Captain Hayden informed the man he was wanted for questioning. The defendant stated he had talked to Detective Chappel and was going to come to the station later that day. Captain Hayden confirmed this information with Detective Chappel and requested the defendant come to the station immediately. According to Captain Hayden, the defendant voluntarily agreed to follow him to the police station. Captain Hayden did not ticket the defendant for failing to yield and did not remember if he returned the defendant's driver's license to him.
At the police station, the defendant denied any involvement in the attack and provided Detective Chappel with the first names of three people who could provide an alibi. The defendant refused to participate in a lineup. Although Detective Chappel informed the defendant he was not under arrest, Detective Chappel testified he would not have been allowed to leave the police station. After taking a short statement from the defendant, and then consulting with his chief and an assistant district attorney, Detective Chappel arrested the defendant on a charge of simple battery. The defendant's picture was taken during the booking process and placed in a photographic lineup from which Ms. Caskey identified the defendant as her attacker.
Subsequently, the defendant was charged in one bill of information with aggravated burglary, in violation of La.R.S. 14:60, and attempted forcible rape, in violation of La. R.S. 14:27 and 14:42.1.[1]
The defendant file motions to suppress the victim's identification of him, as well as his *1023 statements to the police. During the hearing on these motions, the defendant denied that he failed to yield to an oncoming car and stated Captain Hayden did not return his driver's license. The defendant also asserted that the police took his picture and allowed the victim to view the photographic lineup before arresting him. The defendant's motions were denied.
The state severed the charges of aggravated burglary and attempted forcible rape, and then tried the defendant on the charge of attempted forcible rape. However, a mistrial was declared after the jury deadlocked. The state then filed an amended bill of information rejoining the charges and proceeded to trial on both charges.
At trial, Tanya Michelle Jones and Tessa Jackson testified they knew Ms. Caskey and knew her reputation in the community. The two women testified Ms. Caskey had a reputation for untruthfulness.[2] Jessie Chennault, the defendant's mother, testified she did the defendant's laundry and he did not own a grey muscle shirt. She and her husband also testified that when the defendant left their house several hours before the attack, he was wearing a western-style shirt without any undershirt. However, another defense witness, Charles Wesley Gray, testified that on the night in question the defendant was wearing a grey undershirt which was visible under his western-style shirt.
The defendant presented several alibi witnesses. Julie Russell testified she and the defendant were together from approximately 7:00 p.m. on May 15 until 3:30 a.m. on May 16. Ms. Russell testified she and the defendant were hanging out with friends at Cloyd's Corner and at her house. Mr. Gray testified he witnessed the defendant leave Ms. Russell's home at 3:30 a.m. Miranda Trainer testified she spoke with the defendant via citizen's band radio when he left Ms. Russell's and saw the defendant return to Cloyd's Corner before 4 a.m. She further testified that he remained there for 45 minutes to an hour before he left and drove home, followed by Mrs. Trainer and her husband. In summary, the defendant produced witnesses at trial who testified he was with them or in CB contact with them virtually the entire night of the attack.
A unanimous jury convicted the defendant of aggravated burglary. However, a verdict of not guilty was returned on the charge of attempted forcible rape. The trial court adjudicated the defendant an habitual offender and sentenced him to 30 years at hard labor, with credit for time served, pursuant to the Louisiana Felony Sentencing Guidelines.
The defendant appealed. He asserts 13 assignments of error, which may be divided into six general categories for discussion.

MOTION TO SUPPRESS IDENTIFICATION
The defendant complains of the trial court's ruling on his motion to quash or suppress the victim's identification of him in the photo lineup and in court. He argues Captain Hayden executed an illegal arrest and Detective Chappel violated the defendant's fourth amendment rights against unreasonable search and seizure by photographing the defendant; therefore, he contends that the lineup and the identification of the defendant should have been suppressed.

Probable Cause
A peace officer may, without a warrant, arrest a person when the peace officer has reasonable cause to believe that the person to be arrested has committed an offense, although not in the presence of the officer. La.C.Cr.P. art. 213(3); State v. Tasby, 26103 (La.App.2d Cir. 6/24/94), 639 So.2d 469, writ denied, 94-2256 (La.1/13/95), 648 So.2d 1336.
Probable cause for an arrest exists when facts and circumstances known to the officer and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in the belief that the person to be arrested has committed a crime. State v. Gates, 24995 (La.App.2d Cir. 1/19/94), 630 So.2d 1345, writ denied, 94-0640 (La. 6/17/94), 638 So.2d 1091.
*1024 Moments after being attacked, Ms. Caskey described her attacker as a 30 to 40 year old white male, 5'6" to 5'8" tall, and 140 to 160 pounds with dark sandy hair. Ms. Caskey also told police her attacker was driving a white Buick Regal with license plate number ADX 886. Police subsequently determined Garland White owned a white Buick Regal with that license plate. Probable cause existed to arrest the defendant, who matched the physical description given by the victim, when Captain Hayden stopped him. Because the defendant agreed to come to the to station voluntarily, Captain Hayden did not arrest him. Detective Chappel testified he arrested the defendant after a short interview and discussions with the assistant district attorney.
Following his arrest, the defendant's picture was taken in the booking process. Police certainly have the authority to photograph an individual who has been arrested. See La.R.S. 14:133.2. This picture was placed in a photographic lineup from which Ms. Caskey identified the defendant as her attacker. Because police had sufficient probable cause to arrest the defendant, it is not necessary to discuss defendant's assertion that his in-court identification and the lineup identification were the fruit of an illegal arrest.
The defendant's reliance on Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) and Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), is misplaced in that the law enforcement authorities in those cases did not have probable cause to arrest either suspect at the time of their detention. In the instant case, police had probable cause to arrest the defendant after determining that the white Buick Regal belonged to him and that he matched the physical description of the assailant provided by the victim.

Photo Lineup
The defendant asserts the photographic lineup was unduly suggestive because a 12-digit number appeared on the bottom of each photograph and the last six digits reveal a date. The defendant asserts the date 05/16/93 is visible on the bottom of his photograph; therefore, the victim would be more likely to pick him because that was the day on the attack and because police informed the victim they had recently arrested someone. Detective Chappel testified Ms. Caskey looked at the lineup for only a few seconds before identifying the defendant. Ms. Caskey testified she looked at the faces in the pictures and her eyes were almost immediately drawn to the picture of the defendant. Ms. Caskey testified she did not look at the numbers printed across the bottom of the pictures.
A defendant attempting to suppress an identification must first show that the identification procedure was suggestive, and secondly, that there was a likelihood of misidentification by the eye witness. Even if the identification procedure was suggestive, the identification will be admissible, if, under the totality of the circumstances, it is found to be reliable. State v. Davis, 550 So.2d 774 (La.App.2d Cir.1989).
The factors considered in assessing the reliability of the identification include the opportunity of the witness to view the suspect at the time of the crime; the degree of attention paid by the witness during the commission of the crime; the accuracy of the witness' prior description; the level of certainty demonstrated at the identification; and the length of time elapsed between the crime and the identification. State v. Mims, 501 So.2d 962 (La.App.2d Cir.1987); State v. Cotton, 511 So.2d 1207 (La.App.2d Cir.1987); State v. Davis, supra.
Shortly after the attack, the victim gave police a description of her attacker as a white male between 30 and 40 year old, about 5'6" or 5'8" in height, and weighing 140 to 160 pounds. She also described his car and remembered his license plate number. Later that day, police presented a photo lineup to the victim. This lineup contained photographs of five white males, all of whom have similar hair styles and complexions. Moreover, all of the men depicted appear to be approximately the same height and weight. All of the men are standing in front of a small sign that bears the name "West Monroe Louisiana Police Depart." and a twelve *1025 digit number is visible on four of the five pictures. Upon close inspection, it is apparent the last six digits are dates. The photograph of the defendant bears the numbers "XXXXXXXXXXXX"; however, the numbers "93" are so blurred as to be virtually illegible.
Detective Chappel and the victim testified as to the presentation of the lineup. The record reveals no taint of suggestiveness in the manner in which the lineup was assembled, nor in the manner in which it was presented to the victim. Moreover, both Detective Chappel and the victim testified that the identification was spontaneous and almost immediate. Without carefully studying the numbers, it would be impossible to determine the numbers under the photos carried any significance. Therefore, we find that the photographic lineup was not unduly suggestive.
Assuming arguendo that the lineup had been suggestive, the victim's identification of the defendant was highly reliable. The victim had the opportunity to view her assailant for several minutes during the attack, and the parking lot was well lit. The victim provided police with a description of her attacker, as well as the color, make and license number of his car. When the victim was shown the lineup containing the defendant's photograph, she selected his photograph without hesitation. Furthermore, she made this identification on the day of the attack.
This assignment of error has no merit.

MISTRIAL AND DOUBLE JEOPARDY
In related assignments of error, the defendant contends that the trial court erred in granting a mistrial in the first trial on the offense of attempted forcible rape and that his second trial on attempted forcible rape and aggravated burglary charges violated double jeopardy.
Mistrials, when declared without the defendant's consent and if not based on any of the grounds enumerated in La.C.Cr.P. art. 775, will constitute illegal dismissals and activate the principles of double jeopardy. Official Comment (e) to La.C.Cr.P. art. 775; State v. DeGrate, 25732 (La.App.2d Cir. 3/30/94), 634 So.2d 965, writ denied, 94-1362 (La. 10/7/94), 644 So.2d 630. However, La. C.Cr.P. art. 775(2) states that a mistrial may be ordered in a jury case when jurors are unable to agree on a verdict.
The first trial lasted three days; however, according to the minutes, the first day consisted of jury selection, and part of the second day involved resolution of issues outside of the jury's presence. On the third day, the jury retired to deliberate at 6:25 p.m. At 10:15 p.m., the jury returned. At that time, the following exchange took place between the judge and the jury foreman:
By The Court: Ladies and gentlemen have you elected your foreperson?
By Mr. Carr: I have been elected.
By The Court: Do you have report for the Court Mr. Carr?
By Mr. Carr: We're hopelessly deadlocked it looks like right now Judge. We have seven people who are in favor of voting not guilty and five people who are in favor of voting guilty.
By the Court: Do you ladies and gentlemen feel that it would serve any purpose to send you back for further deliberation so that you may weigh your views against those of the other jurors? Do you think it would change anything at all?
By the Reporter: Three unidentified female jurors responded out loud "no, sir".
By the Court: It's the consensus that you are deadlocked seven to five as you mentioned?
By Mr. Carr: Yes, Sir.
The trial court then declared a mistrial.
In State v. Wright, 593 So.2d 759 (La.App. 5th Cir.1992), writ denied, 599 So.2d 313 (La.1992), cert. denied, 506 U.S. 922, 113 S.Ct. 340, 121 L.Ed.2d 257 (1992), jurors deliberated five and one half hours but were unable to agree upon a verdict. The court of appeal held that the discharge of a jury is within the sound discretion of the trial judge and the exercise of such discretion is not ordinarily subject to review, particularly if the transcript shows the jurors simply could not reconcile their differences of opinion.
*1026 When the trial judge declares a mistrial because the jury was unable to reach a verdict pursuant to La.C.Cr.P. art. 775, jeopardy does not attach. See La.C.Cr.P. art. 591, which provides that no one shall be twice placed in jeopardy, "except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant." [Emphasis ours.] See also State v. Nall, 439 So.2d 420 (La.1983).
These assignments of error are without merit.

SEVERANCE AND JOINDER
The defendant claims that the trial court erred in granting the state's motion to sever the aggravated burglary and the attempted forcible rape charges. He also contends that the trial court erred in subsequently allowing the state to rejoin the offenses after the first trial on the attempted forcible rape charge resulted in a mistrial.
In the instant case, the prosecution merely exercised its authority under La. C.Cr.P. art. 61 to sever the charges before the first trial. See State v. Brooks, 541 So.2d 801 (La.1989). While the defendant objected to the state's action, he filed no motion seeking to compel rejoinder. Since the state filed no motion to sever, there is no trial court ruling thereon about which the defendant may now complain. At any rate, the severance of the charge of attempted forcible rape did not prejudice the defendant since the trial court declared a mistrial in the first trial.
As to the subsequent rejoinder of the charges, the defendant asserts the charges were improperly joined in the second trial and that the trial court erred by refusing to sever them. However, La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
Both attempted forcible rape and aggravated burglary are triable by the same mode of trial, and both were a part of the same transaction. Following detailed instructions from the trial court, the jury was given two verdict forms, and it later returned two separate verdicts.
A defendant bears a heavy burden when alleging prejudicial joinder of offenses as grounds for a motion to sever. Factual rather than conclusory allegations are required. State v. George, 26867 (La.App.2d Cir. 4/5/95), 652 So.2d 1382, writ denied, 95-1151 (La. 9/29/95), 660 So.2d 855; State v. Davis, 92-1623 (La. 05/23/94), 637 So.2d 1012, cert. denied, ___ U.S. ___, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
The trial court did not abuse its great discretion by allowing the state to rejoin the offenses. Furthermore, the record is devoid of any evidence that the defendant was prejudiced by the rejoinder. The jury in the first trial was presumably leaning toward a verdict of not guilty on the charge of attempted forcible rape; the jury in the second trial actually rendered that verdict.
The defendant's reliance on the double jeopardy clause in support of this assignment of error is misplaced. For the reasons expressed previously, the double jeopardy clause is not violated by a second trial after a lawfully authorized mistrial. Neither is the double jeopardy clause violated when the state legally joins two charges pursuant to La.C.Cr.P. art. 493.
These assignments of error lack merit.

UNDERLYING OFFENSES
In three assignments of error, the defendant raises issues pertaining to the underlying offenses for aggravated burglary.

Motion in Limine/Motion For New Trial
The defendant argues that the trial court erred in denying his motion in limine and *1027 allowing the state to argue, as the underlying offense of aggravated burglary, the felonies of attempted simple kidnaping and sexual battery. In another assignment of error, the defendant asserts the trial court erred in denying his motion for new trial in which he asserted the evidence was insufficient to convict him of aggravated burglary. Since both assignments present the same basic argument, we consider them together.
An appellate court, in order to affirm a conviction, must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational finder of fact to conclude that every element of the crime was proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190, cert. denied, ___ U.S. ___, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
In order to convict the defendant of aggravated burglary, the state was required to prove the defendant entered a movable where a person was present, without authorization, with the intent to commit a felony therein, and the offender committed a battery upon any person while in such place, or in entering or leaving such place. La.R.S. 14:60; State v. McKnight, 539 So.2d 952 (La. App.2d Cir.1989), writ denied, 548 So.2d 322 (La.1989).
The defendant struck Ms. Caskey in the face, wrestled her to the ground in the parking lot, and attempted to drag her into his car. After Ms. Caskey succeeded in getting into her own car, the defendant pursued her and entered her vehicle without her permission. The defendant committed a battery upon Ms. Caskey when he struck her again, this time in the stomach, and pushed her down across the seat and console. He then tried to get on top of her. Ms. Caskey continued to scream, struggle and beg the defendant not to harm her. The defendant told her that he wouldn't hurt her if she shut up and that he wanted to touch her. During the struggle in the car, he placed his hand inside her shirt and touched her breast. The jury could have inferred from the defendant's actions that he intended to commit the felony of sexual battery.
Ms. Caskey's testimony was corroborated by Ms. Simmons and Mr. Croft who saw her shortly after the attack; they verified her disheveled and bloody physical appearance and her hysterical emotional state. After escaping from the defendant, Ms. Caskey memorized the make of his car and the license plate number before leaving the scene. Police arrested the owner of the car, Garland White, and Ms. Caskey identified him from a photographic lineup.
Although defendant's alibi witnesses testified he was with them all night, a reviewing court accords great deference to a jury's decision to accept or reject the testimony of witnesses in whole or in part. State v. Willars, 27394 (La.App. 2d Cir. 9/27/95), 661 So.2d 673. Moreover, positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Wilson, 27228 (La.App. 2d Cir. 8/23/95), 660 So.2d 571; State v. Miller, 561 So.2d 892 (La.App. 2d Cir.1990), writ denied, 566 So.2d 983 (La.1990). It is clear that the jury resolved the issue of credibility in favor of the victim.
The defendant argues that the jury's verdict of not guilty on the charge of attempted forcible rape amounted to a rejection of sexual battery or an attempt thereof. The defendant further contends that the evidence demonstrates that all he wanted to do was touch the victim's breast, which would constitute only simple battery, not sexual battery.
At the outset, we note that sexual battery is not a responsive verdict to the charge of attempted forcible rape and, therefore, was not an option for the jury. See La.C.Cr.P. art. 814(A)(11). Furthermore, while the jury might not have been able to conclude that the defendant intended to actually rape the victim, it could have found he intended to commit sexual battery based upon his statement and his actions.
Specific intent is a state of mind that need not be proven as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Brown, 618 So.2d 629 (La.App. 2d *1028 Cir.1993), writ denied, 624 So.2d 1222 (La. 1993); State v. Willars, supra. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Brown, supra. While the defendant was only able to complete a simple battery (touching the victim's breast) upon the person of the struggling and pleading victim, the trier of fact could have easily inferred from the totality of the circumstances that the defendant had specific intent to commit a more serious offense. While touching the victim's breast may have constituted only simple battery, it was nonetheless indicative of the sexual nature of the attack in general.
Viewing the facts set forth above in the light most favorable to the prosecution, a rational juror could have readily found that the defendant entered Ms. Caskey's car without her permission, with the intent to commit a felony, i.e., sexual battery, and that he committed a battery on her while in the car by hitting her in the stomach. Therefore, the record supports the jury's verdict of aggravated burglary.
These assignments of error are meritless.

Special verdict and interrogatory form
In a related assignment of error, the defendant contends that the trial court erred in refusing to use his requested special verdict form which included an interrogatory asking the jury to mark which underlying felony they determined the defendant had committed.
In State v. Beavers, 364 So.2d 1004, 1009 (La.1978), the Louisiana Supreme Court discussed the use of special verdicts in criminal cases and then reversed a defendant's conviction in part because the trial court used a special verdict form. The Court stated:
Special verdicts are not favored in criminal cases because of their restrictive effects upon the jury. Special verdicts impair or wholly abrogate the defendant's right to a general verdict, which is an important element of the constitutional right to a jury trial. [Footnote and citation omitted.] The danger inherent in the use of special verdicts in criminal trials is that a reluctant juror might be coerced into reaching a pre-determined result. Although special verdicts may guide a jury toward a logical result, there is grave danger that special verdicts in criminal cases would prevent the jury from performing its most important, uniquely human function, of providing the defendant with a safeguard against arbitrary, unchecked governmental power through community participation in the determination of guilt or innocence.
Accordingly, the trial court did not err in refusing to use the defendant's special verdict form that contained a jury interrogatory.[3]
This assignment is without merit.

HABITUAL OFFENDER ADJUDICATION
In two assignments of error, the defendant challenges his adjudication as a habitual offender by attacking the admissibility of the state's evidence of his prior felony conviction for the offense of aggravated rape.[4] In a third assignment, he contends that the trial court erred in denying his motion to quash the habitual offender bill on the grounds that a portion of the habitual offender law is unconstitutional.

Evidence of Prior Offense
In an habitual offender proceeding the state is only required to establish a prior felony conviction and that the defendant is the person convicted of the earlier offense. On appeal, the sole issue to be resolved is whether evidence was introduced upon which the trial judge could find the *1029 defendant to be the same person as the previously convicted felon. State v. Shepherd, 566 So.2d 1127 (La.App. 2d Cir.1990).
Prima facie proof of a prior felony conviction may be established by compliance with La.R.S. 15:529.1(F) (the "pen pack" provision). However, this provision is not the exclusive method of proving a prior felony conviction; any other competent evidence may be used to establish such proof. State v. Hunt, 573 So.2d 585 (La.App. 2d Cir.1991); State v. Banks, 612 So.2d 822 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1254 (La. 1993); State v. Young, 27237 (La.App. 2d Cir. 8/23/95), 660 So.2d 548.
Identification of the accused may be by testimony of witnesses, by expert opinion as to the fingerprints of the accused when compared to those in the prison record introduced, or by photographs contained in the duly authenticated record. State v. Young, supra; State v. Shepherd, supra.
At the habitual offender hearing, the state introduced copies of: certified court minutes reflecting defendant's conviction and subsequent life sentence for aggravated rape, a photograph of the defendant, fingerprints of the defendant, an executive order commuting the defendant's sentence to 36 years, and a certificate of release from the warden's office. All of these documents were forwarded to the district attorney by the custodian of records for the Louisiana Department of Public Safety and Corrections, Correction Services, at David Wade Correctional Center, and the custodian certified the copies were true. In addition to the pen pack, the state introduced a grand jury indictment charging Garland Wayne White with aggravated rape and a written judgment sentencing the defendant to life in prison. The state also presented the testimony of Brian Newcomer, an expert in fingerprint analysis, who took the defendant's prints on the morning of the habitual offender hearing and compared his prints to the prints in the pen pack. Sergeant Newcomer determined that they matched.
The defendant's assertion that each document in the pen pack must be individually certified lacks merit. The affidavit of certification attached to the front of the pen pack is sufficient to allow the trial court and this court to determine the reliability of the information contained therein. See State v. Hunt, supra. Moreover, the evidence regarding defendant's status as an habitual offender is overwhelming. The trial court did not err in adjudicating the defendant a second felony offender.

Constitutionality
The defendant attacks the constitutionality of La.R.S. 15:529.1(C) on the grounds that it treats felons sentenced to incarceration differently than felons who are sentenced to pay a fine only. Essentially, he contends that the "cleansing period" never begins to run against any person convicted of a felony who is not sentenced to imprisonment. Because the defendant is not a member of the class of people who are alleged to be adversely affected by the statute, felons sentenced to a fine instead of incarceration or probation, he has no standing to raise this issue. Generally, a party does not have standing to challenge the constitutionality of a statute unless the application of that statute adversely affects him. State v. Brown, 389 So.2d 48 (La.1980); State v. Baxley, 94-2982 (La. 5/22/95), 656 So.2d 973.
A defendant who has been charged with violating a criminal statute and who is therefore subject to criminal prosecution is "adversely affected" by that statute and may contest the constitutionality of the sentence authorized therein as facially excessive in violation of La. Const. art. I, Sec. 20. However, in this case the portion of the statute that the defendant asserts is unconstitutional has absolutely no relevance to his adjudication as an habitual offender.
These assignments of error pertaining to the habitual offender proceedings are without merit.

EXCESSIVE SENTENCE
The defendant asserts his 30-year hard labor sentence was unconstitutionally excessive and the trial court erred in denying his motion to amend sentence. As a second felony offender, the defendant faced a sentencing range of 15 to 60 years. La.R.S. 15:529.1(A)(2)(a); La.R.S. 14:60. The trial court sentenced the defendant to 30 years pursuant to the Louisiana Felony Sentencing *1030 Guidelines.[5] The Sentencing Guidelines classify aggravated burglary as a grid cell 1 offense. La.S.G. Sec. 401B. The defendant's prior conviction for aggravated rape results in a criminal history index score of 5 points. La.S.G. Sec. 402D; 402A. Accordingly, the guidelines recommend the defendant be placed in grid cell 1A which recommends a sentence of 330 to 360 months in prison. La.S.G. 403A. The trial court followed the recommendation of the guidelines and sentenced the defendant to imprisonment at hard labor for 360 months or 30 years.
This court has repeatedly held that when a sentence has been imposed within the designated range of the appropriate grid cell, nothing is presented for review because the sentence is appropriate for an offender with that criminal history and it will not be deemed excessive under the Louisiana Constitution. State v. Barnes, 607 So.2d 872 (La.App. 2d Cir.1992); State v. Essex, 618 So.2d 574 (La.App. 2d Cir.1993); State v. McEachern, 624 So.2d 43 (La.App. 2d Cir. 1993); State v. Gladney, 626 So.2d 778 (La. App. 2d Cir.1993); La.S.G. Sec. 201(C). The 30-year sentence imposed upon the defendant was within the sentencing range of the grid cell which the trial court found to be applicable. Therefore, the sentence is not excessive.
Even under a traditional constitutional analysis the 30-year sentence is not an abuse of the trial court's discretion. See State v. Square, 433 So.2d 104 (La.1983); State v. Thompson, 25583 (La.App. 2d Cir 1/19/94), 631 So.2d 555.
Accordingly, the defendant's sentence is affirmed.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] He was also charged separately with attempted simple kidnaping. However, this charge was dismissed at the defendant's sentencing.
[2] The women also testified that they were friends and co-workers of Ms. Caskey's sister-in-law. At the time of the attack, Ms. Caskey was separated from her husband, the sister-in-law's brother.
[3] As an ancillary matter, we note that the defendant sought to introduce the affidavits of two of the jurors in support of his supplemental motion for new trial, wherein he argued that the jury was confused by the definitions of the various crimes. However, such evidence was correctly excluded by the trial court as improper under La.C.E. art. 606(B).
[4] The defendant was convicted of aggravated rape in 1973 and sentenced to life imprisonment. However, his sentence was commuted, and he was released on parole in December 1992, about five months before the present offense.
[5] The Louisiana Sentencing Guidelines were repealed by Acts 1995, § 942, which became effective August 15, 1995; however, they were applicable to the defendant's February 21, 1995 sentence.