963 So.2d 1063 (2007)
STATE of Louisiana, Appellee
v.
Marcus D. GULLEY, Appellant.
No. 42,237-KA.
Court of Appeal of Louisiana, Second Circuit.
August 15, 2007.
*1066 Eric Anthony Wright, New Orleans, for Appellant.
Paul J. Carmouche, District Attorney, Tommy J. Johnson, Philip House, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART, and DREW, JJ.
BROWN, Chief Judge.
While consorting with a prostitute in a local motel, Kenneth Graham was robbed at gunpoint by an intruder. Graham identified defendant, Marcus Gully,[1] as the perpetrator, and a jury convicted defendant of armed robbery. Defendant was adjudicated a second felony offender and sentenced to 49½ years at hard labor without benefit of parole. The two issues raised by defendant in his appeal are whether the evidence presented at trial met due process sufficiency standards and whether the conduct of defendant's counsel during the trial met constitutional competency standards. We affirm.
Sufficiency of the Evidence
Defendant argues that the jury should not have believed the testimony of the victim, Kenneth Graham, and defendant's accomplice, Nicole Myers (the prostitute who was with the victim at the time of the robbery), because they were high on cocaine at the time of the robbery, and their testimony contained inconsistencies and contradictions.
In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the court wrote:
In short, [In re] Winship[, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ], presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.
*1067 The Jackson standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court a means to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App. 2d Cir.08/30/02), 827 So.2d 508, writs denied, 02-3090 (La.11/14/03), 858 So.2d 422, 05-0947 (La.01/27/06), 922 So.2d 541.
The critical inquiry is whether the record evidence, viewed in the light most favorable to the prosecution, could reasonably support a finding of guilt beyond a reasonable doubt.
Trial Testimony
Kenneth Graham testified that on the evening of May 2, 2004, he was driving in Shreveport when he saw a young white female he knew as "Nicole" on the street. Graham gave Nicole (who has several aliases but whose full name is Nicole Myers) a ride to the nearby Sessions Motel (also known as the Livingston Motel) on Pete Harris Drive, where Ms. Myers had a room. In her testimony, Ms. Myers stated that the two went to "handle business." She clarified that she was a prostitute and that Graham was one of her customers. Graham stated that once they got to the motel, Ms. Myers left the room briefly, then returned with some crack cocaine. Graham admitted that he was "buying sex from her" and that they had previously been together more than once but less than five times. On the other hand, Ms. Myers stated that they had previously been together between 10 and 30 times.
Graham testified that he and Ms. Myers smoked crack and had sex. According to Graham, he smoked about two rocks of crack. Ms. Myers estimated that the pair smoked about 40 rocks of crack, or $400 worth. According to Graham, Ms. Myers acted nervous and, after their encounter, she left the room a second time. When she returned, she was accompanied by a black male armed with a handgun. The armed man pointed the gun at Graham and said, "drop it, homeboy."[2] Graham did not understand the request so the intruder told him to drop his money. Graham turned over his wallet, which was empty, but refused to tell the man where his money was. The armed man cycled the slide on his pistol, ejecting a live cartridge onto the motel room floor, and ordered the victim to remove his clothes. Graham complied. Meanwhile, Nicole searched the room and went through Graham's personal effects. She found money in Graham's pants pocket and gave it to the armed man. The intruder took Graham's pants and wallet, ordered the victim not to report the crime because "he knew where I lived," and then fled along with Nicole Myers.
After waiting for a short time, Graham looked out the window of the motel room and saw his pants on the ground outside the room. As he retrieved his pants, Graham spotted a police officer nearby. Graham reported the crime to Shreveport Police Department Officer Tracy Stovall, who went back to the room with Graham and found a live .380 caliber bullet on the floor of the room. Graham told Officer Stovall that he knew the woman as "Nicki" and that he did not know the armed man. *1068 The officer's report states that Graham identified the armed robber as a black male; there are no other physical descriptions of the robber in the report. Graham did not tell Officer Stovall that he had smoked crack cocaine and had sex with Nicole Myers. The crime occurred at approximately 8:00 p.m.
No suspects were apprehended that night. On May 11, 2004, SPD Detective Michael McConnell interviewed Graham, who admitted to having sex with Ms. Myers on the date of the incident, but did not reveal that the two had smoked crack. Graham related to the detective that as he was putting his clothes back on, Nicki left the room and came back with a man, who pulled a semi-automatic on him and forced him to give up his money. The female assisted by searching Graham's clothing. According to Det. McConnell, Graham said that he could identify Nicki, but "might not" be able to identify the male suspect because he [Graham] "was trying to keep from looking at him [the robber]." At trial, however, Graham testified that the robber stood by the door, about five feet from him, and Graham was able to see the man clearly, without any obstructions of his view. He denied telling officers that he attempted to avoid making eye contact with or looking at the robber.
Days later, Det. McConnell located Nicole Myers on a street corner in the Allendale area of Shreveport. Police officers photographed Ms. Myers and used that picture in a photo lineup. Graham, without hesitation, identified Ms. Myers from the photo lineup as the woman involved in the robbery. Det. McConnell arrested Nicole Myers as a principal to armed robbery. Ms. Myers denied any knowledge of the crime and stated she was in Ohio on the date of the robbery.
Thereafter, an informant called Detective McConnell and told him that Marcus Gully was the man involved in the robbery. Detective McConnell testified without objection that, "[A confidential informant] advised that he had heard that I had arrested Nicki and that the individual who committed the armed robbery was the defendant, Marcus Gully. He gave me his [Gully's] tag information, his vehicle information." With that information, McConnell created a photo lineup which included a picture of Gully. This lineup was shown to Graham, who identified Gully as the armed robber. Detective McConnell obtained an arrest warrant for defendant, who voluntarily surrendered to police. Defendant advised Det. McConnell that he had the wrong man.
At trial, Graham again identified Gully as the man who robbed him. Graham testified that he had not known defendant prior to the offense and that after the robbery, "different people [were] calling me, asking me to drop the charges. His [defendant's] mother said  offered to pay the money back."
At trial, Nicole Myers testified to the details of the crime and identified defendant as the man involved in the armed robbery. According to Ms. Myers, at the time of the offense, she did not know defendant's real name. Ms. Myers testified that she pled guilty to attempted armed robbery and was sentenced to seven years imprisonment for her part in this incident. She also testified that she had a subsequent conviction for distribution of a schedule II controlled dangerous substance.
Defendant did not testify at trial. However, he showed the jury that his two front teeth had gold caps, a feature that Graham never mentioned to anyone. In addition, several witnesses testified as to defendant's whereabouts on the evening of the robbery. Defendant's uncle, Bernard Gully, testified that he was with defendant, *1069 defendant's mother, defendant's girlfriend Tanya, and several of defendant's friends at an apartment on Looney Street in Shreveport from about noon until 9:30 p.m. Bernard related that he and defendant sat on the porch of the apartment all afternoon drinking and discussing defendant's upcoming birthday and that he [Bernard] left at 9:00 or 9:30 p.m. Bernard admitted that he was not with defendant the entire time and that it was possible that defendant could have left the apartment and come back during the course of the evening.
Defendant's friend, Robin Jacobs, testified that she was at the Looney Street apartment on the evening of May 2, 2004. Ms. Jacobs stated that she was with defendant the entire night except for a short period of time when defendant left with his mother and girlfriend to take defendant's mother home. Ms. Jacobs stated that she went with defendant and Tanya to a convenience store around midnight.
Defendant's mother, Patricia Gully, stated that on the evening of May 2, 2004, defendant and his girlfriend came to her house to pick her up between 6:00 and 7:00 p.m. They brought her to their apartment, leaving only once to go to the store. Defendant and his girlfriend brought her back home around midnight.
Tanya Miller Gully, defendant's girlfriend at the time of the incident and wife as of trial, also testified. Ms. Gully stated that she rented the apartment at 1464 Looney Street, where the group had gathered on May 2, 2004. She stated that she and defendant went to defendant's mother's home between 6:00 and 7:00 p.m. to pick her up. They later went to a convenience store and at the end of the evening they drove defendant's mother home. They made no other stops that night. Ms. Gully also testified that defendant had his gold front teeth when she met him in 2002 and had them on May 2, 2004.
As the above testimony reflects, both of the witnesses to the crime stated unequivocally that defendant was the armed man involved in the robbery. Although Graham's and Nicole Myers' stories differed in some ways regarding the history of their relationship and their activity prior to the robbery, both had no trouble identifying defendant as the armed man who robbed Graham. Further, the jury was fully apprised of the discrepancies in their stories and of the opportunity that both witnesses had to see the robber during the crime.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.09/18/02), 828 So.2d 622, writs denied, 02-2595 (La.03/28/03), 840 So.2d 566, 02-2997 (La.06/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App. 2d Cir.05/08/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.06/26/98), 719 So.2d 1048.
This includes the testimony of accomplices. An accomplice is a competent witness to testify against her co-perpetrator even if the prosecution offers her inducements to testify; these inducements weigh on the witness's credibility. State v. Jetton, 32,893 (La.App. 2d Cir.04/05/00), 756 So.2d 1206, writ denied, 00-1568 (La.03/16/01), 787 So.2d 299. The credibility of an accomplice's testimony is not within the province of the court of *1070 appeal to decide. Id. Rather, credibility evaluations are within the province of the trier of fact. Id. The fact finder is charged with making a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
We note that defendant's wife testified that she and defendant left the gathering on Looney St. for a period of time after 7:00 p.m. The jury chose to credit the testimony of the victim and defendant's accomplice over that of defendant's witnesses, and we cannot say that this choice was unreasonable and thus outside of their province as the fact finder.
This assignment is without merit.
Ineffective Assistance of Counsel
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ("PCR") in the trial court rather than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App. 2d Cir.06/21/00), 764 So.2d 1164, writs denied, 01-3049 (La.09/20/02), 825 So.2d 1166, 03-1670 (La.05/21/04), 874 So.2d 166. A motion for new trial is also an accepted vehicle by which to raise such a claim. Id. When the record is sufficient, however, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App. 2d Cir.09/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
First, defendant must show that counsel's performance was deficient. This requires a showing that his attorney made errors so serious that she was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The assessment of an attorney's performance requires that her conduct be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions, and trial strategy, strongly presuming she has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La.App. 2d Cir.1991). See also State v. Tilmon, 38,003 (La.App. 2d Cir.04/14/04), 870 So.2d 607, writ denied, 04-2011 (La.12/17/04), 888 So.2d 866.
Second, defendant must show that his attorney's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. He must show that but for his attorney's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. Strickland, supra; State v. Pratt, 26,862 (La.App. 2d Cir.04/05/95), 653 So.2d 174, writ denied, 95-1398 (La.11/03/95), 662 So.2d 9.
*1071 Failure to Object to Hearsay Testimony
The actual question asked by the ADA to Detective McConnell was "did you ever develop anyone else as a suspect?" The detective responded affirmatively but added on his own that he was given defendant's name by a confidential informant as the man who committed the robbery. This was not responsive or prompted by the ADA's question. Once the detective had a name, he was able to conduct another photo line-up where defendant was identified by the victim.
Defendant asserts that his attorney's failure to object was a serious error as Detective McConnell's statement was objectionable hearsay because it contained the statement or out-of-court assertion [by the confidential informant] that the defendant was the person who committed the crime. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); State v. Legendre, 05-1469 (La. App. 4th Cir.09/27/06), 942 So.2d 45.
Detective McConnell's statement was not responsive to the question asked by the ADA; however, the answer explained the course of the officer's investigation and the steps leading to the presentation of the photographic line-up to the victim. See State v. Maise, 00-1158 (La.01/15/02), 805 So.2d 1141.
If an objection had been made, it would have only emphasized the confidential informant's information and at best, resulted in an instruction from the court for the jurors to disregard. A reviewing court must give deference to the trial counsel's judgment and tactical decision. In any event, there is no reasonable probability that the outcome of the trial could have been different had defense counsel objected and the jury been instructed to disregard the remark. Such errors are subject to a harmless error analysis under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See State v. Legendre, supra.
Defendant also argues that his attorney should have objected to the victim's statement that defendant's mother offered to pay him the money that had been taken from him during the robbery. This related a direct statement by defendant's mother to Graham. Defendant's mother testified and could have denied the statement but was not asked. This was not hearsay. Even if considered hearsay, the outcome of the case would not have been different had defendant's attorney made a successful objection.
Failure to File a Motion to Suppress the Photo Lineup
Defendant next urges that his attorney was ineffective for failing to move for the exclusion of the photo lineup evidence and resulting identification. Specifically, defendant points to the fact that Graham did not provide a description of the robber to police and his statement to the investigating officer that he tried to avoid looking at the robber's face.
In order to suppress an identification, a defendant must show that the identification was suggestive and that there was a likelihood of misidentification by the eyewitness. Even if the identification procedure was suggestive, the identification will be admissible if, under the totality of the circumstances, it is found to be reliable. State v. Birch, 41,979 (La.App. 2d Cir.05/09/07), 956 So.2d 793; State v. White, 28,095 (La.App. 2d Cir.05/08/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, 98-0282 (La.06/26/98), 719 So.2d 1048. See also Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The factors to be considered include the opportunity of the witness to view the criminal *1072 at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the identification, and the time between the crime and the identification. Manson, supra; State v. White, supra. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. Manson, supra.
Considering the Brathwaite factors listed above, the line-up was not suggestive and was reliable. Defendant's actual objection goes to the credibility of the victim and the sufficiency of the evidence.
Failure to Conduct an Adequate Voir Dire of Juror Ramsey
Finally, defendant contends that his attorney was ineffective in handling the voir dire of one juror, Martha Ramsey, who stated during questioning that both her husband and her cousin had been murdered. We note that defendant used only eleven peremptory challenges and thus, under those facts can not show prejudice.
Ms. Ramsey said that these incidents would not affect her in serving on the jury, and there is nothing in the voir dire that shows, on the record, that counsel was ineffective for failing to challenge Ms. Ramsey peremptorily. This assignment of error is without merit.
Error Patent Review
We have reviewed the record for errors patent on the face of the record and have found none.

Conclusion
For the above set-forth reasons, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Defendant's name is spelled "Gulley" in the bill of information and on the cover of the appeal. However, the correct spelling of defendant's surname appears to be "Gully". During trial, the state obtained, without objection from defendant, a verbal order from the trial court deleting the "e" from all references to defendant's last name. Rp. 439.
[2] Both victim and defendant are black; Myers is white.