897 So.2d 854 (2005)
STATE of Louisiana, Appellee,
v.
Willie Earl HOPKINS, Appellant.
No. 39,258-KA.
Court of Appeal of Louisiana, Second Circuit.
March 2, 2005.
*857 Samuel Thomas, Tallulah, Louisiana Appellate Project, by Kenota Pulliam Johnson, Carey J. Ellis, III, Rayville, for Appellant.
*858 James D. Caldwell, District Attorney, Kenneth A. Brister, Laurie R. Brister, Assistant District Attorneys, for Appellee.
Before CARAWAY, PEATROSS and MOORE, JJ.
MOORE, J.
Willie Earl Hopkins was indicted for aggravated rape, armed robbery, simple arson resulting in damage of over $500, simple burglary, and illegal possession of a firearm by a convicted felon. A 12-member jury found him guilty as charged on all counts. The district court imposed the mandatory sentence of life imprisonment at hard labor without benefits for the aggravated rape, and consecutive and concurrent sentences for the remaining offenses. Hopkins now appeals, advancing five assignments of error. For the reasons expressed, we affirm.

Factual Background
The charges arose from a crime spree in which Hopkins was joined by his brothers Roy and James,[1] his nephew Ronald Coleman, and his sister's fiance Ronnie Barnes. James and Barnes testified at Hopkins's trial. By their account, several men met at Roy's apartment on Foster Street in Lake Providence on the evening of December 28, 2001 and began drinking gin and beer. Hopkins joined the group around 9:30 or 10:00 PM. At some point Coleman went out to his car and fetched a black handgun with a silver handle, apparently a .380, which he passed around to everybody in the room, including Hopkins, a convicted felon on parole at the time. Another person present in Roy's apartment, Ricky Frith, corroborated that Hopkins handled the gun.
Hopkins said, "I know where to hit a lick at"; according to James, Hopkins said the place was Panola Pepper Company, a hot sauce processing plant on U.S. Hwy. 65 in Lake Providence where Hopkins and Barnes were formerly employed. Hopkins added they just needed a car to get there; Coleman replied that he was low on gas. The five men piled into Coleman's car and drove off.
They first stopped at Hopkins's apartment, where he got a down-filled jacket and some latex gloves; he handed a pair to each man in the car. They then stopped at a gas station, picking up more gin and some fuel. Then Hopkins directed Coleman to take back roads down the levee until they parked near Panola Pepper. Hopkins and Roy got out of the car first and ran to the office building; by the time James and Barnes got there, Hopkins had broken out the front door glass but was unable to enter because of the deadbolt. After Hopkins and Roy tried a screwdriver without success, Barnes went back to the car, got a tire tool and pried the front door open. While James stood lookout, Hopkins, Roy and Barnes ran inside, entered various offices and stole a cash box, some bank bags and a telephone. Before they left, both Barnes and James saw Hopkins light a piece of paper in the owner's office, drop it and run out the building. The men returned to the car, where Coleman had been waiting for them, and drove back to Roy's apartment. Barnes could see Panola Pepper in flames as they drove away. On the road, Hopkins and Roy tossed several items out the rear windows; at Roy's apartment, Barnes threw the telephone over the rear fence.
Inside Roy's apartment, the men pried open the cash box, finding less than $100 *859 in it. They divided the money equally, but Hopkins was irked at getting only about $18. He said he knew where they could "hit another lick." Hopkins changed out of the down jacket and into a black leather jacket. The men loaded back into the Coleman's car and drove toward the Economy Inn on Hwy. 65. Coleman pulled in the second entrance and stopped the car; as Hopkins and Roy got out, Coleman handed Hopkins the handgun they had passed around the apartment earlier. Coleman, Barnes and James then drove to a nearby parking lot and waited.
Within moments, a silver Hyundai Accent drove up to the Economy Inn and parked under the canopy. The driver, a 21-year-old woman from Kansas, was stopping there to get a room. She testified that as soon as she opened her car door, two black men ran up and demanded her money. One of the men, wearing a black leather jacket, held a gun on her and threatened, "I'm not playing." He fired a shot into the air, struck her in the side of the face and took the $15 in her wallet. The men demanded more money; the victim gave her wedding ring to the other assailant, who was dressed in a button-down shirt. The gunman then reached and stroked her breasts and genitals, grabbed her shoulder and pulled her through bushes and behind the motel. There, the men stripped her except for her socks. They then took turns repeatedly raping her at gunpoint, orally, vaginally and anally.
The manager of the motel, Ashwin Bhatt, heard the gunshot and called 911. Deputy Terrance Brown, who had already reported to the blaze at Panola Pepper, was dispatched to the Economy Inn, where Mr. Bhatt told him two black men had dragged a white woman behind the motel. Dep. Brown shone a flashlight down the muddy field and saw two men dragging a naked woman. He identified himself as an officer and fired a shot into the air; the two men took off running. Dep. Brown walked the woman back to the Economy Inn and put her in an ambulance. She was taken to East Carroll Parish Hospital, where she reported that she had been hit in the face with a gun, robbed, dragged around the corner of the motel, and raped. The emergency room physician on duty, Dr. Amin El-Malah, confirmed her injuries and diagnosed rape. He performed a rape kit test which was sent to the North Louisiana Crime Lab in West Monroe.
As the victim was leaving the motel in the ambulance, Dep. Brown received a dispatch that a man was running along the top of the levee. Dep. Brown, along with Dep. Huey George, ran to the levee and found a running man dressed in a black leather jacket, torn T-shirt and sweat pants. They recognized him as Hopkins, an in-law of Dep. George's. Hopkins told the deputies that two white men in a red truck from Arkansas had just tried to rob him. Accepting his story, the deputies let him go.
A short while later, the sheriff sent another dispatch that the man running on the levee should be arrested. Deputy Wilbert Johnson located Hopkins, who was soaking wet. Hopkins explained that he was walking to a grocery store near the Economy Inn, some quarter- to half-mile away, to get something to drink. Dep. Johnson did not believe him, as it was past midnight and all nearby stores were closed. He arrested Hopkins.
From their vantage point down the highway, Coleman, James and Barnes had seen the sheriff's vehicles and ambulance converging on the Economy Inn. They left and drove around, intending to return and pick up Hopkins; however, when they passed the motel and saw him in handcuffs, they decided to flee. Coleman *860 dropped off Barnes and James, but James walked back to Roy's apartment, arriving about 1:00 or 2:00 AM. James testified that Roy phoned him there, saying that deputies had caught Hopkins, and that he (Roy) had kept running, got muddy and lost his shoes.
Two of Roy's in-laws, John Williams and Genevieve Thompson, testified that shortly after 1:00 AM, Roy knocked on their door, wet, muddy and in his stocking feet. They gave him a change of clothes.
After Hopkins was arrested, deputies took his photograph; three days later, they e-mailed a photo lineup to authorities in Oklahoma. The victim immediately identified Hopkins as the gunman who robbed and raped her; she could not identify the other assailant, whom she referred to as the "button shirt guy." On January 11, 2002, the victim returned to Lake Providence and viewed a physical lineup; once again, she immediately and definitely selected Hopkins as the gunman, robber and rapist. She identified him a third time at trial in March 2004. She also described the short, black leather jacket that Hopkins was wearing.
Citizens discovered some money bags on the side of the road near Panola Pepper; Panola's owner, Grady W. Brown, testified that these were used in his business. He also confirmed that there would have been no more than $100 cash in the office. John Newcomer, an investigator for the State Fire Marshal, testified that the front door had been forced open and the fire started in the owner's office with a piece of lit paper and no other accelerant. He estimated that the fire caused about $2 million in damage.
A black telephone was found behind Roy's apartment; a .380 shell casing was found under the canopy of the Economy Inn, near the victim's car; a pair of blue latex gloves was lying on the ground near where the victim had been rescued; and a pair of boots belonging to Roy was found in the field behind the motel. A search warrant executed at Roy's apartment located, on his bedroom dresser, a jewelry box containing the victim's wedding ring. Officers also found a tire tool in Roy's kitchen closet and a pair of blue latex gloves in the kitchen wastebasket.
Kendall Stracener, a DNA analyst, examined the victim's rape kit at the North Louisiana Crime Lab. He testified that the anal and vaginal swabs did not yield any DNA findings, and that her fingernail scrapings provided enough only to tell that the material came from a man. Deputy Wiltcher testified that one money bag found along the side of the highway was too wet to be tested for fingerprints, and that the latex gloves found in the field had to be discarded because of mildew.
Hopkins gave no statements while in custody. At trial, however, he testified that he had indeed gone to his brother Roy's apartment on the evening of December 28, and had been drinking with Roy, James, Coleman and Barnes. He admitted that Coleman had passed around a gun, but denied that he ever touched it. He maintained that the group left in Coleman's car only to buy more booze, riding around a while until stopping at a Chevron station to get "the last drink." He insisted that they went nowhere near Panola Pepper and he knew nothing about the fire until the next day. After they left the Chevron station, however, they drove by the Economy Inn, where Coleman (armed with his pistol) and Roy got out and walked toward the motel. Not wanting to be involved in a crime, Hopkins took off running; he denied any involvement in the rape and robbery. He admitted he was wearing a black leather jacket similar to the one described by the rape victim; however, he insisted that Coleman was *861 also wearing a black leather jacket and was the true perpetrator. He testified he was still running when deputies stopped him on the levee; he was afraid to tell them what had happened because he did not want to go back to jail. He asserted that investigators never found his fingerprints or DNA on anything, and he was innocent of all charges.
As noted, Hopkins was indicted for aggravated rape, armed robbery, simple arson resulting in damage over $500, simple burglary and illegal possession of a firearm by a convicted felon. Hopkins filed two motions to suppress the physical lineup and a motion to sever offenses, all of which were denied. After a three-day trial, a 12-member jury unanimously found him guilty as charged on all counts. The district court sentenced him to the mandatory life term at hard labor without benefits for aggravated rape; a consecutive 60 years at hard labor without benefits for armed robbery; a consecutive 15 years at hard labor for simple arson; a concurrent 12 years at hard labor for simple burglary; and a concurrent 15 years at hard labor without benefits, plus a fine of $1,000, for illegal possession of a firearm by a convicted felon. This appeal followed.

Discussion: Sufficiency of the Evidence
By his first assignment of error, Hopkins urges the evidence was insufficient to support his convictions on all five charges. He does not dispute that the offenses occurred, but asserts that the state did not adequately prove that he was the offender. After recapitulating the trial evidence, Hopkins asserts there was no physical evidence linking him to the crimes, and that the only identification came from two co-defendants and a victim whose testimony was tainted by a suggestive lineup. He notes various inconsistencies in the co-defendants' accounts and asserts that they struck favorable plea bargains in exchange for their testimony. He concludes that the state failed to meet its burden of proving that he was the perpetrator under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and State v. Smith, 430 So.2d 31 (La.1983).
The state asserts that James, Barnes, Frith and the rape victim were all eyewitnesses whom the jury was entitled to believe. State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The state also cites numerous items of physical evidence that corroborate critical portions of the eyewitness accounts. The state concludes that the evidence was sufficient to support each conviction.
When issues are raised on appeal both as to the sufficiency of the evidence and one or more trial errors, the reviewing court first reviews the sufficiency claim. This is because the defendant may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if the evidence is constitutionally insufficient. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, supra. In any review of sufficiency, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id., 443 U.S. at 319, 99 S.Ct. at 2789; State v. Major, XXXX-XXXX (La.12/1/04), 888 So.2d 798. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Ultimately, all evidence  both direct and circumstantial  must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational *862 jury. State v. Robinson, XXXX-XXXX (La.4/14/04), 874 So.2d 66; State v. Plunkett, 37,306 (La.App. 2 Cir. 9/12/03), 855 So.2d 831, writ denied, 2003-2943 (La.2/13/04), 867 So.2d 688.
In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Powell, 27,959 (La.App. 2 Cir. 4/12/96), 677 So.2d 1008 (on rehearing), writ denied, 96-1807 (La.2/21/97), 688 So.2d 520. Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La.App. 2 Cir.), writ denied, 566 So.2d 983 (1990). A victim's or eyewitness's testimony alone is usually sufficient to support the verdict, as appellate courts will not second-guess the credibility choices of the trier of fact beyond the constitutional standard of sufficiency. State v. Davis, XXXX-XXXX (La.6/27/03), 848 So.2d 557; State v. Ponsell, 33,543 (La.App. 2 Cir. 8/23/00), 766 So.2d 678, writ denied, 2000-2726 (La.10/12/01), 799 So.2d 490. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson, supra; State v. White, 28,095 (La.App. 2 Cir. 5/8/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, 98-0282 (La.6/26/98), 719 So.2d 1048.
A jury may convict upon a co-defendant's uncorroborated testimony. State v. Matthews, 450 So.2d 644 (La.1984). An accomplice is qualified to testify against an associate in crime even if the prosecutor offered him inducements to testify; such inducements merely affect the witness's credibility. State v. Neal, XXXX-XXXX (La.6/29/01), 796 So.2d 649; State v. Jetton, 32,893 (La.App. 2 Cir. 4/5/00), 756 So.2d 1206, writ denied, XXXX-XXXX (La.3/6/01), 787 So.2d 299. A conviction may be based even on the uncorroborated testimony of an accomplice or of someone making an agreement with the prosecution, provided the testimony is not incredible or otherwise insubstantial on its face. State v. Neal, supra.
We have closely reviewed the record. Three witnesses  James, Barnes and Frith  testified that Hopkins handled the .380 handgun that Coleman passed around Roy's apartment. Hopkins admitted he was there when this occurred, but denied he actually held the gun. The jury was certainly entitled to reject Hopkins's self-serving version of the incident.
Two witnesses  James and Barnes  directly implicated Hopkins in suggesting the burglary at Panola Pepper, directing the group to that location via back roads to avoid detection, and providing gloves to avoid fingerprint evidence. Barnes admitted prying open the door and seeing Hopkins light a piece of paper which he dropped in Mr. Brown's office. The fire marshal corroborated that the door had been pried open and the fire started with a lit piece of paper in the owner's office. Barnes testified that as they fled the burning building, Hopkins and Roy tossed things out the car window; money bags were indeed found along the side of the road. James testified that Barnes threw an office phone over Roy's back fence; the phone was found there. Barnes testified that they got about $18 apiece out of the cash box, which corresponds to Mr. Brown's estimate of the cash in the box. The testimony of James and Barnes is more than amply corroborated by this physical evidence. A rational jury could *863 easily accept this direct and circumstantial evidence over Hopkins's incredible claim that he was nowhere near Panola Pepper when the burglary and arson occurred.
In addition to graphically describing wanton violence and sexual depredation inflicted by her assailants, the female victim positively identified Hopkins as her robber and rapist on three separate occasions. The jury was obviously entitled to accept her unwavering identification. She testified that the unarmed assailant took her wedding ring; according to James, the unarmed assailant was Roy, and the ring was found in Roy's apartment. Mr. Bhatt and Dep. Brown also corroborated several details of the victim's account. James testified that shortly after the incident, Roy phoned to say he had lost his shoes and got muddy fleeing from officers; Roy's shoes were found in the field near the motel, and his in-laws confirmed that he showed up at their house shoeless and needing a change of clothes. Notably, just moments after the incident, Hopkins was running away from the motel, and he gave false and inconsistent statements first to Deps. Brown and George and then to Dep. Johnson.
In brief, Hopkins has amplified the perceived weaknesses in the state's case. It is true that in his "supplemental report" (actually his only written report of the incident), Dep. Brown overestimated Hopkins's height as 6'2". Likewise, the rape kit samples failed to provide enough DNA to identify or exclude Hopkins as the rapist. These deficiencies, however, are minuscule when viewed in the totality of the criminal scheme proved by the state. Hopkins also urges that in exchange for their testimony, Barnes and James each pled guilty to one count of simple burglary and two counts of accessory after the fact; Barnes was to get a maximum sentence of 10 years. However, these witnesses' criminal records and potential bias were plainly disclosed to the jury. As noted, other testimony and much physical evidence supported their account, which cannot be deemed "incredible or otherwise insubstantial on its face." State v. Neal, supra.
On this record, any rational jury could have found every essential element of the offenses and, in addition, concluded that the state negated any reasonable probability of misidentification. This assignment of error lacks merit.

Disclosure of Brady Material

By his second assignment of error, Hopkins urges the state withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Hopkins shows that he filed a timely motion for discovery, but at trial the state introduced Exhibit S-53, a letter allegedly written by him in jail and not provided to the defense prior to trial. Defense counsel objected to this on grounds that the state failed to disclose it, but the court overruled the objection. Hopkins contends that the letter, addressed to Barnes, is exculpatory in that its author suggested he "would help Ronnie Barnes and my brother get out." Hopkins concedes that the state never showed that he actually wrote the letter, but argues that withholding it violated due process, warranting reversal under Brady and United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). He also suggests that the state offered the letter to prove he was involved in the crimes.
The state urges that it offered the letter only to impeach Hopkins's claim that he did not communicate with Barnes and Roy in jail. The state concedes that under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), it must disclose evidence used to impeach prosecution witnesses at trial, but not evidence to impeach defense witnesses. The state concludes *864 that even if the letter was Brady material, it did not affect the outcome the trial and thus was not material.
Due process requires the disclosure of evidence that is both favorable to the accused and material either to guilt or punishment. Brady v. Maryland, supra; State v. Bailey, 367 So.2d 368 (La.1979). The Brady rule also requires the disclosure of evidence adversely affecting the credibility of government witnesses. Giglio v. United States, supra. When such information is not disclosed and it is material in that its suppression undermines the confidence in the outcome of the trial, then constitutional error occurs and the conviction must be reversed. United States v. Bagley, supra. Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. Materiality hinges on "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Further, the defendant must show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819.
The letter, Exhibit S-53, fails to meet either prong of the requirement for disclosure as Brady or Giglio material. In the first place, it is not exculpatory; apparently addressed to Barnes, it reads, "I, am going to help you & my Borther [sic] to get out. I, am going to do all I can do for you all." Conceivably, the author thought Barnes and Roy should "get out," but there is no assertion that the author is innocent. Moreover, the state offered this to impeach Hopkins, a defense witness. Since Hopkins was not called by the prosecution, evidence used to impeach him does not fall within the scope of the Giglio rule. State v. Washington, 533 So.2d 989 (La.App. 1 Cir.1988).
Even if the letter was Brady material, there is no showing that the failure to disclose it pretrial had any bearing on the trial. It was offered close to the end of a three-day trial in which the rape and robbery victim, as well as two accomplices in the crime spree, directly implicated Hopkins in the offenses, and other evidence supported their testimony. The jury had ample ground to discredit Hopkins's claims of innocence even without the introduction of the letter. Finally, the suggestion that the letter somehow proved Hopkins's guilt is totally unsupported. This assignment of error lacks merit.

Suggestive Lineup Procedure
By his third assignment of error, Hopkins urges the district court erred in failing to suppress a suggestive lineup. Hopkins shows that he filed, and the court denied, two motions to suppress the identification evidence. He contends that the victim identified him only because she had seen him in photographs showing him in handcuffs and e-mailed to Oklahoma. He urges that she did not get a good look at her assailant, was extremely nervous and inattentive, and gave no description immediately after the incident, all of which made her identification unreliable under Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). He concludes that the circumstances of the instant identification are comparable to those warranting a reversal in State v. Martin, 595 So.2d 592 (La.1992).
The state concedes that it e-mailed a photo lineup to authorities in Oklahoma several days after the incident, but argues *865 that in both the photo and the physical lineup, Hopkins was not singled out. It contends that the procedure was not suggestive and did not approach the "show-up" that was disapproved in State v. Martin, supra. Finally, the state disputes the claim that the victim was too inattentive or nervous to get a good look at her assailant; she satisfied the requirements of Manson v. Brathwaite, supra, immediately and positively identifying Hopkins three times.
An identification process is suggestive if it unduly focuses a witness's attention on the suspect. State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134. For this reason, single photograph "show-ups" are generally viewed with suspicion. State v. Martin, supra; State v. Harper, 93-2682 (La.11/30/94), 646 So.2d 338. Strict identity of physical characteristics among the persons depicted in a photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification. Id. The question for a reviewing court is whether the procedure is so conducive to irreparable misidentification that due process was denied. Id.; Manson v. Brathwaite, supra. A defendant attempting to suppress an identification must prove both that the identification procedure itself was suggestive and that misidentification likely resulted from it. La. C. Cr. P. art. 703 D; State v. Bright, supra; State v. Stokes, 36,212 (La.App. 2 Cir. 9/18/02), 828 So.2d 631, writ denied, 2002-2807 (La.9/5/03), 852 So.2d 1023.
Hopkins did not designate the initial, photographic lineup as part of the appellate record. He testified that officers took his picture while he was handcuffed, but the silent record does not confirm that the photo shows him wearing handcuffs. There is also no support for Hopkins's argument that the photo was a suggestive "show-up" as in State v. Martin, supra. As for the physical lineup, the sheriff's lineup log shows that it included six black men with black hair, ranging in height from 5'7" to 6'2"; five of them weighed between 155 and 220 (Barnes weighed 290). There is no showing that Hopkins was unduly singled out. Contrary to an assertion in brief, the victim did not mistakenly identify Hopkins as the "button shirt guy"; that suggestion was made by trial counsel and sharply refuted by the victim. The record does not show that the identification procedure was suggestive.
Furthermore, Hopkins has not shown any substantial likelihood of irreparable misidentification. Photos of the scene depict a well-lighted area under the canopy; the victim described the location, clothing and actions of both men; her level of attention was adequate, as evidenced by her graphic description of the robbery and rape; the length of time between crime and confrontation was average. Most importantly, she consistently identified Hopkins as the gunman. This evidence easily satisfies the requirements of Manson v. Brathwaite, supra. The district court was not wrong to find the identification evidence admissible. This assignment of error lacks merit.

Presence of Counsel at Lineup
By his fourth assignment of error, Hopkins urges the district court erred in failing to suppress the suggestive lineup, which was conducted out of the presence of his trial attorney. He contends that a pretrial confrontation is a "critical stage" of the proceedings at which the right to counsel attaches. In support he cites State v. Hattaway, 621 So.2d 796 (La.1993), and United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). He concedes that he signed a waiver of counsel, but argues that the state failed to prove that it was knowing and voluntary.
*866 The state shows that the lineup occurred on January 11, 2002, over a month before the case went to the grand jury. The state submits that the presence of counsel is not required at pre-indictment lineups, Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and argues that Hopkins failed to show that his waiver of counsel was anything but knowing and voluntary.
The overwhelming weight of jurisprudence holds that an accused is not entitled to be represented by counsel at a pre-indictment lineup. Kirby v. Illinois, supra; State v. Bickham, 404 So.2d 929 (La.1981); State v. Moore, 95-116 (La.App. 3 Cir. 10/4/95), 663 So.2d 250.
State v. Hattaway, supra, cited by both parties, involved a defendant who had already made an initial court appearance and received appointed counsel; a plurality of the supreme court held that after these events, the defendant could not validly waive counsel and make an incriminating statement. However, the court overruled this holding in State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, concluding that after the constitutional right to counsel has attached, whether invoked or not, the defendant may waive it. Finally, in Stewart v. State, 95-2385 (La.7/2/96), 676 So.2d 87, the court declined to apply the rule of Hattaway to police lineups conducted without benefit of counsel and before indictment. The court concluded:
[T]he need for counsel at an identification lineup, before the State has obtained an indictment and set its course on prosecution, is not such a "bedrock component" of the fair adjudication of a criminal case. It is neither so likely to result in prejudice, nor so damaging if it does.
In short, Hopkins had no constitutionally guaranteed right to the assistance of counsel at the physical lineup on January 11, 2002, because it was held before his indictment and initial court appearance on February 20, 2002. State v. Wallace, XXXX-XXXX (La.App. 4 Cir. 11/26/03), 862 So.2d 286, writ denied, XXXX-XXXX (La.4/8/04), 870 So.2d 269; State v. Duplessis, 00-971 (La.App. 5 Cir. 12/13/00), 777 So.2d 529.
At the hearing on the motion to suppress, the state offered Hopkins's signed waiver, and Dep. Wiltcher testified that had Hopkins requested counsel, the lineup procedure would have been halted. Hopkins offered no evidence to refute this showing. The district court was therefore not wrong to find a valid waiver. State v. Moore, supra. This assignment of error lacks merit.

Motion to Sever
By his fifth assignment of error, Hopkins urges the district court erred in denying his motion to sever all five offenses. He contends that the offenses are not "of the same or similar character" or "based on the same act or transaction or two or more acts or transactions connected together or constituting parts of a common scheme or plan," and thus not suitable for joinder under La. C. Cr. P. art. 493. He also argues that the sole motivation for joinder was to "introduce inflammatory evidence of other crimes which would not otherwise have been probative."
The state responds that all five offenses were connected by Hopkins's plan to hit "licks" to get money, and that offenses may be joined if they are part of a single crime spree. State v. Winn, 412 So.2d 1337 (La.1982). The state submits that the motivation for the charge was judicial economy.
Motions to sever offenses are addressed to the sound discretion of the district court and its ruling will not be *867 disturbed on appeal absent an abuse of discretion. State v. Deruise, 98-0451 (La.4/3/01), 802 So.2d 1224, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001); State v. Lowery, 33,905 (La. App. 2 Cir. 2/28/01), 781 So.2d 713, writ denied, XXXX-XXXX (La.2/22/02), 809 So.2d 978. The defendant bears a heavy burden of proof when he alleges prejudicial joinder of offenses. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012; State v. Lowery, supra. Factual rather than conclusory allegations are required. Id. In determining whether the joinder is prejudicial, the court may consider whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant would be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition; and whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Deruise, supra.
All five offenses were clearly unified by the single scheme of stealing money. Moreover, the offenses were disparate enough that the jury could not have been confused by the various counts or unable to sort the evidence into the proper compartments. Trial counsel skillfully cross-examined all state witnesses and argued the issue of identity, thus dispelling any notion that Hopkins was "confounded" in presenting his defenses. Although the number and severity of the offenses may have led the jury to infer a criminal disposition, there is no showing that the jury was "hostile" to Hopkins. Finally, we observe that Hopkins did not designate the hearing on the motion to sever as part of the appellate record. Without this transcript, we have no other arguments or evidence on which we may disturb the court's sound discretion. State v. Lowery, supra. This assignment of error lacks merit.

Conclusion
We have reviewed the entire record and find nothing we consider to be error patent. La. C. Cr. P. art. 920(2). We therefore affirm the convictions and sentences of Willie Earl Hopkins.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] We are using "Hopkins" herein to refer only to the defendant. His brothers are referred to as "Roy" and "James."