917 So.2d 1252 (2005)
STATE of Louisiana, Appellee
v.
Marcus Dewayne WILHITE, Appellant.
No. 40,539-KA.
Court of Appeal of Louisiana, Second Circuit.
December 30, 2005.
*1253 Louisiana Appellate Project by Peggy J. Sullivan, Monroe, Marcus, Dewayne Wilhite, for Appellant.
Jerry L. Jones, District Attorney, George Daniel Ross, Assistant District Attorney, for Appellee.
*1254 Before BROWN, C.J., and WILLIAMS and DREW, JJ.
DREW, J.
Marcus Dewayne Wilhite was convicted as charged of second degree murder and sentenced to life imprisonment without benefits. The defendant now appeals his conviction and sentence. We affirm.

FACTS

THE INVESTIGATION
On March 23, 1999, Dwandya Hollins noticed something unusual in a thicket off Buckhorn Bend Road in Ouachita Parish on her way to the store. When she returned with her husband and others, the partially-clothed body of a black male was discovered on the west side of the roadway. The victim was identified as Arijoray Green. The Ouachita Parish Sheriff's Office was notified and upon arrival at that location, Sergeant Michael Goin found what appeared to be the victim's clothing scattered around the victim's body. There were drag marks on the ground from two bloodstains at the edge of the roadway leading toward the body's location in the thicket. The officers photographed and videotaped the crime scene and collected the physical evidence.
A couple of months later, the police received a call from a man who discovered a sunken car while putting his boat into the Ouachita River at the Lazarre Point area. When the car was pulled from the river, a check of the license tag and VIN number revealed that the car belonged to the victim.
Thereafter, a tip from an inmate led investigators to develop Marcus Wilhite and Percy Franklin as suspects in Green's murder. Investigators learned that Franklin was talking to other inmates about the murder and his black 9mm handgun. Detective Larry Ludlow of the Ouachita Parish Sheriff's Office researched this information and discovered that the weapon had been confiscated by the Monroe Police Department during the execution of a search warrant in an unrelated investigation at 1404 South Fourth Street.
Franklin was interviewed by investigators, including Det. Ludlow, and gave two custodial statements. The first statement, which was recorded, implicated only the defendant in the murder. The information "matched-up" with some of the details learned during the investigation, i.e., that the body was stripped and thrown on the side of the road, Green's clothes were thrown in the bushes, and the vehicle was dumped off Lazarre Point area. In Franklin's second custodial statement, which was not recorded, he confessed to his involvement in the crime but named the defendant as the person who shot and killed Green. Det. Ludlow showed the 9mm handgun to Franklin during one of the two statements, and Franklin identified the handgun as belonging to him, and as the weapon that Wilhite used to kill Green.

TRIAL TESTIMONY
Investigators, including Det. Ludlow, Sgt. Goin and others, testified at trial regarding the above facts. Det. Ludlow identified the photograph of the handgun at trial as the same handgun Franklin identified as his, and as the murder weapon, during one of his statements.

Dr. Steven Hayne
This forensic pathologist testified that:
 The victim was fatally wounded by gunshot from a large caliber handgun which entered the back of the head at very close range and exited the top of the bridge of the nose.
 This wound was consistent with the victim having been the driver of a car and *1255 having been shot by someone sitting behind him.
 The body also had a series of superficial skin abrasions indicative of being dragged a short distance at or about the time of death.
 The corpse was in the state of "early decomposition change."

Dwandya Hollins
Hollins additionally related that two or three days before the body was found, she was driving home at about 4:00 a.m. when she observed four or more men standing outside at the same location where the body was found. They were near a parked car, which was a dark blue four-door. One man was standing with his back turned to her and his head down, like he was urinating. He put his hand up to his face to shield it from her car's headlights.

Percy Franklin
Franklin testified that:
 Franklin, Wilhite, and Green were together on the night of the murder at the duplex where Franklin lived in the apartment adjacent to Jeffery ("Jethro") Jenkins on South Fourth Street in Monroe.
 Wilhite lived nearby, along with his girl-friend (Sheeir Williams), and her children.
 Green, Wilhite, along with "Hamp" and Derrick, were playing dice.
 Franklin didn't play dice because he doesn't gamble, but he was in and out of the house selling dope.
 The duplex was a drug house from which Franklin, Wilhite and Jenkins all sold marijuana, all three of them being supplied by Joe Orange.
 The gambling ended sometime after mid-night with Wilhite having lost some money to Green.
 Wilhite convinced Green to drive him to see some women staying in a house in Robinson Place and invited Franklin to come along.
 Green got into the driver's seat of his car, Franklin got into the passenger seat and Wilhite sat in the backseat behind Green.
 While Green was driving on Berg Jones Lane, the defendant shot Green in the back of the head and Green slumped over into Franklin's lap, soaking his pants.
 Wilhite told Franklin to grab the steering wheel, but he couldn't.
 Wilhite then grabbed the wheel and climbed over the seat while Franklin moved the defendant's feet away from the floor pedals.
 Wilhite told Franklin to get the money out of Green's pocket.
 Franklin complied, handing the bloody money over to the defendant.
 When the car came to a stop sign, Franklin climbed into the backseat.
 Wilhite drove to Buckhorn Bend Road and stopped in the curve.
 Franklin helped the defendant drag Green's body into some bushes.
 He helped Wilhite undress Green's body.
 The motive for the murder was robbery because Wilhite had lost money to Green in the dice game.
 Franklin denied keeping any of Green's money, explaining the roll of money on him that night as being the proceeds from a day of selling marijuana.
 Franklin admitted that the defendant told him earlier of his plan to rob and kill Green, but asserted that he thought the defendant was "lying" and didn't know the defendant was going to do it "right then."
*1256  Franklin further volunteered that the defendant told him many times before that he was going to kill Green.
 He and the defendant drove Green's car to the boat launch at Lazarre Park in West Monroe, put it in neutral and pushed it into the river.
 Then Franklin and Wilhite walked to the house where Estella Wilson and Joe Orange lived and told Orange what happened.
 Wilson stayed in the bedroom and wasn't present during this conversation.
 Franklin was covered in blood, except for his face.
 Wilhite had some blood on his clothes, but not as much.
 He and Wilhite both went home.
 The 9mm handgun used by Wilhite to shoot Green belonged to Franklin, who usually kept the handgun under his mattress, but it had been missing for a week or two before the shooting.
 Franklin did not know that the defendant had possession of his handgun until the defendant used it to shoot Green.
 After the shooting, Franklin got his handgun back either that night or the next day and put it back under his mattress.
 Franklin admitted that he told police that Dorsey a/k/a Briggs told him that the defendant stole his handgun.
 The handgun was later seized by officers during an unrelated drug raid on Franklin's apartment in the duplex.
 Franklin told many people about the killing.
 He also admitted offering to drive two men in an old blue Ford Taurus to see Green's dead body on the Sunday night following the murder, but that they declined the offer and he never returned to the place where the body was dumped.
 Franklin identified pictures of his handgun at trial.
 He admitted that he had been convicted of manslaughter for his part in Green's murder and, as of the time of Wilhite's trial, had not yet been sentenced.
 He denied any knowledge of negotiations between his attorney and the state regarding his testimony at the defendant's trial and its effect on his sentence.

Lavalle B. Salomon
Franklin's attorney, Lavalle B. Salomon, testified that Franklin's sentencing was deferred until after the defendant's trial in order that Franklin's sentencing judge could be aware of Franklin's cooperation before sentencing. Solomon, however, assured that no guarantees were made regarding Franklin's sentence.

Jeffery ("Jethro") Jenkins
Jenkins testified at trial that:
 Franklin's testimony was correct, in that he lived in a duplex in the apartment adjacent to Franklin, and that Green, the defendant and Jenkins were playing dice there on the night of the murder.
 Wilhite did not know Green until he introduced them on the night of the crime.
 Franklin was in and out of his apartment that night.
 Franklin kept a handgun in his apartment.
 He never saw Wilhite with the handgun unless Franklin was also present.
 He didn't remember either "Hamp" or Derrick being at the dice game.
 Green left when the game ended at about 7:00 p.m.
 Wilhite left Jenkins' home to go to the store sometime around 7:00 p.m., and then he and Wilhite went to the liquor store sometime before midnight.
 Wilhite joined him at his house to drink until the defendant left to go home.
*1257  Jenkins didn't know whether or not the defendant went to Church's Chicken.

Sheeir Williams
The defense called several witnesses at trial, including the defendant's former girl-friend, Sheeir Williams, who testified that:
 She is Franklin's cousin by marriage.
 Franklin had previously lived with her and Wilhite for about a month before moving into a nearby duplex.
 She and Franklin had argued because he wouldn't follow her rules, so he moved out.
 Regarding the night of the crime, Williams testified that she saw the defendant and Jenkins at her house around midnight when they woke her up.
 Wilhite had a McDonald's or Burger King bag with him.
 She went back to sleep and didn't know Wilhite's whereabouts from midnight until 4:00 or 5:00 the next morning, when she woke up and saw him sleeping with her baby on his chest.

Joe Orange
Joe Orange testified that:
 He admitted he knew the defendant, but denied any knowledge of the details of the instant crime, and denied that Franklin and the defendant came to his house on the night of the crime.
 He had told the detectives the same thing when they questioned him during the investigation.

Estella Wilson
Estella Wilson, Orange's former live-in girlfriend, refuted Orange's testimony and basically corroborated Franklin's testimony by testifying that:
 Franklin and the defendant came to their house in the early morning hours on the night Green was killed.
 She stayed in the bedroom but overheard Franklin and the defendant talking to Orange about how they had just killed someone.
 She heard Franklin say, "Man, we just killed somebody."
 She also heard Franklin say something about them losing some money.
 Franklin stayed the night with her and Orange.
 Orange later drove the defendant home.
 Franklin was staying with her on Morrison Street when the murder was committed.
 She made him move out a couple of days after she found out he was involved in the murder.
 The defendant was at her house another time after the crime and Orange tried to convince the defendant to turn himself in.
 The defendant told them that he "should have shot his (Franklin's) `punk ass' too."
 At the time of trial, she had charges pending, but denied that there was any agreement between her attorney and the state regarding her testimony.

Christopher Dorsey a/k/a Briggs
Dorsey denied knowing anything about the dice game, the crime, or the defendant stealing Franklin's handgun.

Marcus Wilhite
Finally, the defendant testified that:
 He denied killing Green or ever going to Orange's house and saying he killed someone.
 He played dice with Jenkins and some others on the night of the crime at the *1258 duplex that Jenkins and Franklin shared.
 Jenkins introduced him to Green.
 He lived nearby with Williams at the time, and Franklin was living in the duplex next to Jenkins.
 He left the dice game at about 7:00 or 8:00 that night at the request of Williams.
 He went to the house he shared with Williams, and then went to get some food at Church's Fried Chicken.
 He then walked with Wilhite to the liquor store and joined the defendant at his and Williams' house until about 1:00 or 2:00 in the morning.

VERDICT AND POST-TRIAL MOTIONS
After the trial on the merits, the jury rendered a verdict of guilty of second degree murder by a vote of eleven to one. The defense filed a motion for new trial, motion for acquittal notwithstanding the jury verdict, motion for judgment of acquittal, and motion to quash the jury verdict. Additional motions for new trial and a supplemental motion for new trial were filed. After an evidentiary hearing, all motions were denied.
The defendant was sentenced to serve a term of life imprisonment without benefit of probation, parole or suspension of sentence. The trial court designated this offense as a crime of violence and denied any eligibility for diminution of sentence for good behavior. The defendant's motion for an out-of-time appeal was granted.

DISCUSSION

SUFFICIENCY
Defendant argues that:
 The direct and circumstantial evidence failed to support his conviction of second degree murder when reviewed under the precepts of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 Only Franklin's testimony puts the defendant in Green's car and the handgun in his hands.
 Franklin and Wilson both had pending prosecutions and had motives to lie for the state.
 Franklin's testimony was not credible, as evidenced by his admission that he lied in his first statement to police when he said he was not present at the shooting.
 Franklin's testimony was contradicted by the testimony of other witnesses.
The state argues that the record supports the defendant's conviction, noting that the defense discredits the testimony of its own witness by attacking Wilson. It further notes that Wilson related that the defendant had confessed to the murder to her and expressed regret for not killing Franklin. The state concludes that the record amply supports the conviction.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson, supra, in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
*1259 This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048. A jury may convict upon a co-defendant's uncorroborated testimony. State v. Matthews, 450 So.2d 644 (La.1984); State v. Hopkins, 39,258 (La. App.2d Cir.3/2/05), 897 So.2d 854. An accomplice is qualified to testify against an associate in crime even if the prosecutor offered him inducements to testify; such inducements merely affect the witness's credibility. State v. Neal, XXXX-XXXX (La.6/29/01), 796 So.2d 649, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Jetton, 32,893 (La.App.2d Cir.4/5/00), 756 So.2d 1206, writ denied, XXXX-XXXX (La.3/6/01), 787 So.2d 299. A conviction may be based even on the uncorroborated testimony of an accomplice or of someone making an agreement with the prosecution, provided the testimony is not incredible or otherwise insubstantial on its face. State v. Neal, supra; State v. Hopkins, supra.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1; State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 96-1991 (La.2/21/97), 688 So.2d 521. Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Doby, 540 So.2d 1008 (La.App. 2d Cir. 1989), writ denied, 544 So.2d 398 (La. 1989). Specific intent is that state of mind *1260 that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 25,071 (La. App.2d Cir.6/23/93), 621 So.2d 94.
The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988). The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
This record amply supports the jury's conviction of the defendant of the crime of second degree murder. The evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that all of the elements of second degree murder were proved beyond a reasonable doubt. See State v. Hearold, supra; State v. Bosley, supra. The testimony of the defendant's accomplice, if believed, proves that the defendant shot and killed the victim at very close range, indicative of the defendant's specific intent to kill or inflict great bodily harm upon the victim. See State v. Seals, supra; State v. Dooley, supra.
The accomplice's testimony is partially corroborated by the testimony of Wilson, as well as the testimony and physical evidence regarding the location and condition of the victim's body, car and crime scene. The resolution of any conflicting testimony about factual matters depends upon a determination of the credibility of the witnesses, and the matter is one of the weight of the evidence, not its sufficiency. See State v. Allen, supra. This court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. See State v. Gilliam, supra. The evidence is sufficient to support this conviction.

DENIAL OF MOTION FOR NEW TRIAL AND SUSTAINING THE STATE'S OBJECTION TO THE INTRODUCTION OF THE AUDIOTAPE OF KAWANNA GREY
Wilhite filed a supplemental motion for new trial alleging that juror Kawanna Grey committed jury misconduct, in that:
 She talked about the facts of the case to Will Minor, her live-in boyfriend, before the jury returned a verdict.
 She told Wilhite's mother that she had voted not guilty, even though her written polling form showed that she voted guilty by checking "yes."
 She entered into a recorded conversation with a family member of the defendant in which she asserted that she voted not guilty.
Wilhite further argues that Ms. Grey should have been allowed to testify so as to clarify her vote.
At an evidentiary hearing, testimony was given by Derrick Wilhite (the defendant's brother), Sammie Donoway, Gussie Wilhite a/k/a Boyd (the defendant's aunt), Linda Hamilton (the defendant's mother) and the defendant. These witnesses basically testified that Grey and Will Minor were in a relationship and lived together at the time of trial. Minor attended the trial and rode home with Grey. Two witnesses attempted to relate that Minor had knowledge of what transpired during jury deliberations. Upon questioning by the trial *1261 court, the defense related that both Grey and Minor had moved away. The trial court refused to allow the introduction of Grey's taped conversation into evidence, citing La. C.E. art. 606(B) regarding inquiry into the validity of a verdict. The hearing continued with the defendant's testimony that he rode home from the trial every day in the same car as Grey, and that he saw Minor make hand gestures to Grey during the trial. All of the motions were denied, with the trial court basically finding that the witnesses were not credible regarding the issue of juror misconduct.
Defendant cites La. C.E. 606(B), which states, in part, that
". . . a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention."
Defendant argues that the evidence presented at the hearing showed that:
 there was indeed private contact between one of the jurors and her boyfriend, who was a spectator at trial;
 this was an extraneous influence sufficient to invalidate the jury's verdict because the boyfriend could tell the juror what happened in the courtroom when the jury was removed; and
 the effect of this improper juror conduct was not harmless.
The state contends that since defense motions contain no well-pleaded allegations of juror misconduct, no further inquiry is necessary. Assuming for argument's sake that the allegations contained in the motions are true, the state contends that not every case of juror misconduct necessitates the granting of a new trial. The state argues that the testimony presented at the hearing did not specify specific actions amounting to misconduct, and notes that neither Grey nor Minor were present to testify for the defense. It contends that there was no testimony that the jury verdict was based on impermissible factors or sources. Even so, the state argues that it is well settled that affidavits and other testimony by jurors cannot be used as evidence to impeach their verdict.
La. C.E. art. 606(B), regarding inquiry into validity of verdict or indictment, provides:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
The prohibition contained in this article, previously set forth in La. R.S. 15:470, is intended to preserve the finality of jury verdicts and the confidentiality of discussions among jurors. State v. Hampton, 27,703 (La.App.2d Cir.2/28/96), 670 So.2d 1349, writ denied, 96-1063 (La.11/15/96), 682 So.2d 758. Only well-pleaded allegations of prejudicial misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which a juror may testify. Mere conclusory *1262 statements devoid of any specificity are insufficient. State v. Hampton, supra.
Juror misconduct is not grounds for an automatic mistrial; prejudice must also be established. State v. Day, 414 So.2d 349 (La.1982); State v. Richardson, 33,272 (La.App.2d Cir.11/1/00), 779 So.2d 771, writ denied, XXXX-XXXX (La.10/26/01), 799 So.2d 1151.
The decision on a motion for new trial rests within the sound discretion of the trial judge and his ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Hampton, supra.
As in Hampton, supra, the instant defendant's allegations are not sufficiently particular to justify juror testimony or the admission of the juror's taped conversation regarding the verdict. The defendant did not allege any particular facts at the hearing, nor did he allege or show any actual prejudice. That is, the defendant's mere conclusory statements devoid of any specificity are insufficient. State v. Hampton, supra. The record reflects that the trial court did not abuse its sound discretion in refusing to allow the admission of the juror's taped conversation, or in finding that there was not a showing of juror misconduct sufficient to merit the granting of a new trial.

DECREE
We AFFIRM the defendant's conviction and sentence.