942 So.2d 677 (2006)
STATE of Louisiana, Appellee,
v.
Jacqueline BAKER, Appellant.
No. 41,325-KA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2006.
*678 Louisiana Appellate Project by James Edward Beal, for Appellant.
Jerry L. Jones, District Attorney, Madeline M. Slaughter-Young, Assistant District Attorney, for Appellee.
Before BROWN, STEWART and DREW, JJ.
DREW, J.
Jacqueline Baker was prosecuted on three counts of cruelty to the infirm, pursuant to La. R.S.14:93.3.[1] The jury trial produced these results:
1. On count one, involving the victim Harlen Martin, Ms. Baker was convicted of the responsive misdemeanor charge of negligent injury;
*679 2. On count two, involving the victim Robert Frostenson, Ms. Baker was convicted as charged; and
3. On count three, involving the alleged victim Melvin Fowler, Ms. Baker was acquitted.
She was sentenced to two years at hard labor on each of the two counts of conviction, suspended, to be served concurrently, subject to three years of probation. The defendant now appeals her conviction and sentence. We reverse the misdemeanor conviction on count one. We affirm the felony conviction and sentence on count two, as well as the attendant probationary term and conditions, instructing the trial court to allow community service work in lieu of payment of court costs, if the defendant is unable to pay.

FACTS
The defendant was employed as a certified nursing aide ("CNA") by the Northeast Louisiana War Veteran's Home from June 7, 2002, to April 15, 2004. The home:
 is an institution owned by the Louisiana Department of Veteran's Affairs;
 is a licensed nursing facility specifically for war veterans who have served at least 90 days during a time of declared war;
 serves as both an assisted living facility and nursing home for veterans; and
 served as the residence of all three alleged victims during different time frames between 2000 and 2005.
At the time of trial, all victims were deceased.
On December 9, 2002, the defendant exited a patient's room and reported that the patient tried to fight her, almost hitting her in the face. The patient, Melvin Fowler, was a non-ambulatory patient on the Alzheimer's unit of the home. Erica White, a licensed practical nurse working the unit, entered Fowler's room and found him upset, alleging that Baker had struck him. White noticed injuries to the victim's face (bruised) and arm (scratched). In a written statement explaining the incident, the defendant stated she was attempting to check Fowler's diaper tape when he swung his arm trying to hit her. At that point, the defendant claimed she moved backwards, and in doing so, she accidentally pushed the bedside table into the victim's bed, causing these injuries.
The home conducted an internal investigation into the incident but the abuse allegations could not be substantiated. Pending the investigation, the defendant was suspended for three days with pay and thereafter was given a letter of counseling issued by the home's director. The letter:
 ordered Baker to complete several courses relating to patient care;
 was not made part of the defendant's permanent personnel file;[2]
 permanently relieved her of all assignments to the home's Alzheimer's unit; and
 extended her employment probationary status (normally one year) by three months.
The home did not inform the police regarding the incident, but contact was made by Fowler's daughter, resulting in an investigation by Detective Tracy Heath of the Monroe Police Department, who interviewed Fowler, with mixed results, due to Fowler's inability to understand much of the questioning and his difficulty in speaking. As a part of her investigation, Detective Heath interviewed members of the home staff, and the defendant herself, who gave a recorded statement denying abusing Fowler, claiming an accident consistent *680 with the written statement she had previously provided to the home.
Detective Heath testified:
 she conducted an informal and unsuccessful experiment in Mr. Fowler's room trying to verify whether the injuries could have occurred as stated by the defendant; and
 she referred the results of her investigation to the District Attorney's Office.
Later during the defendant's employment, two patients were observed with previously unreported injuries on February 22, 2004. Separate incident reports were produced detailing the injuries to Martin and Frostenson, the victims in counts one and two, respectively.
Regina Reeves, a registered nurse employed by the home, testified that:
 she worked the 7:00 a.m.-7:00 p.m. shift on February 22, 2004;
 Mrs. Harlen Martin asked her to examine a rash on Mr. Martin's chest, whereupon she discovered a swollen bruised lump on his head;
 she wrote an incident report detailing the victim's injury;
 she contacted Martin's doctor and was advised to arrange his transport to the hospital emergency room;
 she completed an incident report detailing the matter; and
 she noted that Martin was not verbal and could not be interviewed during the home's investigation.
As Reeves was completing paperwork for the transport of Martin, Nurse Catherine Davis requested that she check on Frostenson's hand. Due to her inability to respond to the situation immediately, Ms. Reeves asked Nurse Vicki Ellis (who was working the next shift) to check the injury.
During the same shift when nurse Reeves made her observations, Catherine Davis, another nurse at the home:
 observed victim Frostenson's left hand to be swollen and bluish; and
 was told by Frostenson that he had hit his hand while being transferred from his bed to his wheelchair by the CNAs.
It was not until March 30, 2004, that CNA Sherbra Schiele reported the defendant's apparent abuse of Martin and Frostenson. According to Schiele, she was a new hire assigned to work with the defendant for orientation. Defendant acquainted Schiele with the workplace and took her on rounds to the patients' rooms, on either Schiele's first or second day on the job.
Schiele testified that she and the defendant entered Frostenson's room sometime during the early morning on February 22, 2004, at which time Schiele observed the defendant rousing Frostenson from his sleep. Schiele further testified that Frostenson was upset about being roused and argued with the defendant after he was placed in his wheelchair "kind of hard." At some point during the argument, Frostenson had his hand in the defendant's face and called her a "black b***h." In response to this comment, the defendant grabbed Frostenson's hand and bent his fingers backwards. Schiele recalled that Frostenson told the defendant to stop, at which point the defendant released the hand. Schiele stated that she discussed the incident with Nurse Erica White later that day but made no further reports at that time.
Approximately 20 minutes after the incident with Frostenson, the defendant and Schiele entered Martin's room. According to Schiele, the defendant checked Martin's diaper, but made an attempt not to wake him. While the defendant and Schiele were in the room, Martin awoke and began *681 to tremble. The defendant and Schiele pulled Martin up in the bed using a draw sheet. As Martin (a man of small stature) was being pulled up in the bed, the defendant "pulled him up real fast" and Martin's head was bumped on the headboard of the bed. Schiele testified that the defendant's actions appeared to be a mistake, "because it could . . . that could easily happen, you know, when we're pulling somebody up it happens a lot."
After the incident with Martin, Schiele testified that she did not wish to work with defendant anymore and asked if they could split their work on subsequent days. Schiele noted that she was bothered by the events but did not report it to anyone until prompted to do so by Erica White. After Schiele's reports of abuse were made on March 30, 2004, internal investigations were conducted by the home, and the Monroe Police Department was contacted. Monroe police conducted an investigation, and after giving her statement, the defendant was arrested and initially charged with two counts of cruelty to the infirm (victims Martin and Frostenson). Thereafter, the state amended the charges to reflect three felony counts of cruelty to the infirm, adding the incident with victim Fowler.
After a trial on the merits of the case, the defendant was found guilty of the responsive verdict of negligent injury as to count one (Martin), guilty as charged as to count two (Frostenson), and not guilty as to count three (Fowler). The defendant was illegally sentenced to two years on count one, and the same sentence on count two. Both sentences were suspended and the defendant was placed on three years' active probation with a special condition that she attend anger management classes. The defendant was also ordered to pay court costs with 30 days in the parish jail in default of payment of the costs. It is from this conviction and sentence that the defendant now appeals.

RELEVANT LAW
The law on sufficiency is well settled.[3] *682 La. R.S. 14:93.3, Cruelty to the infirmed, provides in part:
A. Cruelty to the infirmed is the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged person, including but not limited to a person who is a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility.
B. "Caregiver" is defined as any person or persons who temporarily or permanently is responsible for the care of the infirmed, physically or mentally disabled adult, or aged person, whether such care is voluntarily assumed or is assigned. Caregiver includes but is not limited to adult children, parents, relatives, neighbors, daycare institutions and facilities, adult congregate living facilities, and nursing homes which or who have voluntarily assumed or been assigned the care of an aged or infirmed person or disabled adult, or have assumed voluntary residence with an aged or infirmed person or disabled adult.
C. For the purposes of this Section, an aged person is any individual sixty years of age or older.
In this instance, to convict the defendant of cruelty to the infirm, the state had to prove that the victim was a person at least 60 years old and that the defendant's intentional or criminally negligent treatment of the victim caused unjustifiable pain or suffering to the aged person. In viewing the evidence in the light most favorable to the state, the state has clearly met its burden as to count two of the bill of information.

TESTIMONY OF EMPLOYEES OF THE HOME
During the presentation of its case, the state called employees of the home to testify regarding the incidents of abuse (Frostenson and Martin). The only eyewitness to the incidents, Schiele testified that:
 she witnessed the defendant cause injury to both Martin and Frostenson;
 she told Nurse Erica White about the incidents on the day they occurred, but she did not immediately make any other reports;
 she felt the defendant was "doing them wrong. Doing patients wrong";
 after talking with White and several other employees of the home, Schiele reported the incidents to the nursing supervisor, Vicki Ellis;
 she gave a written statement about the incidents on March 30, 2004;
 despite the fact that she did not make an immediate report, she had a hard time sleeping and the incidents were always on her mind;
 she talked to the defendant at work, but did not express any feelings to the defendant about the matter; and
 she found it difficult to report the incidents to the CNA supervisor, Patricia Coleman, because she thought the defendant and Coleman were good friends, an observation she made on her first night of work.
Nurse Erica White testified that:
*683  she discussed the defendant's actions with Schiele on a few occasions;
 she advised Schiele to report the incidents to the nursing supervisor but did not report the information herself;
 she generally considered the defendant as calm and very nice with the patients, but in light of the Fowler incident, she found Schiele's comments believable.
Pamela Handy testified that:
 she is a licensed practical nurse;
 she supervised the CNAs working at the home during the time period that the defendant was employed;
 on the day Frostenson was injured, Handy heard an argument between the defendant and Frostenson sometime during the early morning hours (4:30-5:00 a.m.);
 nonetheless, she did not enter the room; and
 after learning of Frostenson's injury during a telephone conversation, Handy later recounted the details of the argument to Ellis and Coleman.
Vicki Ellis, a nursing supervisor, testified that on February 22, 2004, she examined Frostenson's hand at the request of Reeves. When asked how his hand had been injured, Frostenson said that he hit his hand on the bed when the CNAs were getting him out of bed. He later told Ellis that the CNA wearing the dress had been in his room at the time of the injury. The defendant was the only employee wearing a dress on that shift. According to Ellis, the victim appeared uncomfortable discussing the incident when the defendant was in the room.

ISSUES
I. Sufficiency as to Count One (Victim Martin)
The defendant argues that the state's star witness testified that the injury to Martin was accidental and that there was no testimony in the record to indicate that the injury to Martin's head was intentional or criminally negligent. In the state's view, overwhelming evidence supports the convictions for cruelty to the infirm in each of the three counts, and the jury's sympathy for the defendant led to the conviction on the responsive verdict.
Viewing the evidence in a light most favorable to the prosecution, we find the negligent injuring verdict rendered by the jury in count one is not supported by the record. La. R.S. 14:39, a responsive verdict to cruelty to the infirm, states in part, negligent injuring is the inflicting of any injury upon the person of another by criminal negligence. Defined by La. R.S. 14:12, criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
Ordinary negligence does not equate to criminal negligence; thus, the state is required to show more than mere deviation from the standard of ordinary care to prove criminal negligence. State v. Beason, 26,725 (La.App.2d Cir.4/7/95), 653 So.2d 1274, writ denied, 95-1388 (La.10/27/95), 661 So.2d 1359; State v. Wilcoxon, 26,126 (La.App.2d Cir.6/22/94), 639 So.2d 385, writ denied, 94-1961 (La.12/16/94), 648 So.2d 386.
The testimony and evidence presented by the state fails to present sufficient evidence, when viewed in the light most favorable to the prosecution, to prove that the defendant acted with such a disregard for Martin's welfare that it amounted to a gross deviation from the standard of care *684 that should have been applied in this situation.
Essentially, the only evidence was from Schiele, who testified she thought Martin's head was accidentally bumped against the headboard. Prior to the following exchange, Schiele stated Martin's body began shaking and the defendant scolded him to stop.
Q. Okay. And when y'all pulled him up where was his head in the bed when y'all got him pulled up?
A. We got him pulled up touching the head of the bed, the wooden part of the bed, the head of the bed.
Q. Did the top of his head hit the wooden part?
A. Yes, ma'am.
Q. Okay. And how did that happen?
A. Ms. Baker she was you know, like pulled him up real fast and I'm like okay, you know, and that's when his head hit the head of the bed.
Q. Okay, so because he was pulled up fast his head made contact with the top of the bed?
A. Yes, ma'am.
Q. Could you see that it did anything to the top of his head?
A. No, ma'am.
Q. Okay, did she say anything to him at that point?
A. No, ma'am. She didn't say anything.
Q. Did he say anything?
A. He didn't say anything. I don't even think he could talk.
Q. Okay. Did he cry out or make any kind of noises?
A. No, he didn't say nothing.
Q. Okay, so, when she told him I wish you'd stop that shaking did she say it to him more than once?
A. No, she just said it once.
Q. All right. And did she say it to him . . . use the tone that she used. Describe or tell the ladies and gentlemen of the jury exactly what tone she used?
A. I wish you would stop that shaking.
Q. Okay. And . . . All right. I'd like to show you what I'm going to mark for identification purposes as State's exhibit 27 and after his head came into contact with the top of the bed did you examine his head to see if there was any damage to the head?
A. I didn't see any damage to his head. I did look at his head. At the time I didn't see anything that, you know, had happened to his head.
Q. Okay. So, after this incident where he was made to come into contact with the top of the bed did you tell anybody about that incident?
A. No, ma'am. Because I thought it was just like a mistake, you know.
Q. You thought it was a mistake?
A. Yes, ma'am.
Q. And why do you think it was a mistake?
A. Because it could . . . that could easily happen, you know, when we're pulling somebody up it happens a lot.
Q. Okay. You said she pulled him up quickly?
A. Yes, ma'am.
Q. Okay. So, you're on one side and she's on the other side and y'all are pulling him up with a draw sheet?
A. Yes, ma'am.
Q. Okay. And when she pulled him up quickly did you go with her?
A. Ma'am?
Q. Who was leading?
A. She was. But I . . . it's like I had to follower (sic) her or he would *685 have been left in the middle of the bed.
Q. Okay. Was he a big man, a little bitty man?
A. He was a little small man.
Q. Little man. So, were you surprised that his body moved so easily?
A. Yes, ma'am.
. . .
Later, on cross examination, Schiele testified:
Q. . . . Okay. Now, with regards to Mr. Martin. Okay Mr. Harlen Martin you said that you saw him bump his head when the sheet was pulled down, is that your testimony?
A. No, pulled up.
Q. Pulled up. Okay. And you said that from what you could see there was no intentional behavior on the part of Ms. Baker that it was just simply in the state that it could have happened, is that your testimony?
A. Yes, sir. That could have happened to anybody.
Q. Okay. Could have happened to you?
A. Yeah, it could have happened to me.
Q. Could have happened to me?
A. Uh, huh.
Q. Could have happened to anybody?
A. Uh, huh.
Nurse Regina Reeves testified that the hospital staff has training in how to move patients using the procedure employed by the defendant and Schiele at the time Martin's head was bumped.
While the facts may establish that the defendant was careless and perhaps even negligent in moving a small-framed man so quickly, there is nothing in the record to show that the defendant's actions amounted to a complete or blatant change from the customary or agreed-on course of action required in this situation. The eyewitness stated she believed it was an accident and that it could have happened to anyone. Schiele testified that she examined the victim's head immediately and saw no apparent injury at the time of the incident. Based on this testimony from the only eyewitness, the state has failed to present sufficient evidence by which a reasonable jury could find the defendant guilty of the responsive verdict of negligent injury. The essential element of criminal negligence is not supported by the record, and we vacate this conviction.
II. Sufficiency as to Count Two (Victim Frostenson)
The defendant argues that despite the eyewitness testimony, Frostenson reported that he injured his hand while being lifted out of his bed. The state counters that its eyewitness was credible and apparently believed by the jury.
The state adequately proved all requisite elements by which to sustain the verdict of guilty as charged. The evidence reflects that the defendant was in contact with the victim on the day the injury was discovered, that the victim was over the age of 60, and that the defendant's action had caused unjustified pain and suffering.
Schiele's testimony was unequivocal that she actually saw the defendant bend back the hand of the victim, Frostenson, thus causing him unjustified pain, suffering, and injury. Despite the fact that the jury was presented with an alternate explanation for the victim's injury, the jury nonetheless chose to believe the testimony of Schiele regarding the issue. The jury apparently chose to discount the defendant's advancement of a possible motive (recent argument) for the witness making her report of the injuries some four weeks later. Finding no internal contradiction or irreconcilable conflict with physical evidence, Schiele's testimony, apparently believed by the jury, is sufficient support by which to sustain the conviction relative to Martin.
*686 III. Empaneling of the Petit Jury
The defendant argues that the trial court failed to swear the entire jury panel together as a group and thus failed to comply with La. C. Cr. P. art. 790. The record supports this claim. The defendant further argues that because of this mistake, the defendant's conviction should be vacated and the matter remanded for a new trial. We disagree. No contemporaneous objection was made and therefore defendant waived any right to raise this issue on appeal. The trial court must be given an opportunity to correct any errors at the time the glitch occurs.
In this instance, the verdict is sufficiently supported by the evidence presented at trial, and the failure to swear the entire jury panel surely did not contribute to that verdict. Further, the failure does not affect substantial rights of this defendant as would be required to reverse this jury's verdict.
IV. Excessive Sentence as to Count One
The defendant was convicted on this count of the responsive verdict of negligent injury, under La. R.S.14:39. She correctly argues that the trial court imposed an excessive sentence. Since we have acquitted her of the charge, this point is moot.
V. Error Patent: Failure to Advise of Post-Conviction Relief Delays
During the defendant's sentencing hearing, the trial court did not advise the defendant of the time period within which to apply for post-conviction relief. The Louisiana Supreme Court has held that La. C. Cr. P. art. 930.8(C), which requires the trial court to inform the defendant of the limitations period for filing an application for post-conviction relief, is supplicatory language which does not bestow an enforceable right on an individual defendant. State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189. Accordingly, we hereby advise her that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.

DECREE
We vacate the conviction and enter a judgment of acquittal on count one. We affirm the conviction, sentence, and probationary conditions on count two. We direct the trial court to allow the defendant to perform community service work to defray the court costs assessment, should the trial court find that she is indigent and therefore unable to pay the assessment.
COUNT I. CONVICTION REVERSED AND VACATED. JUDGMENT OF ACQUITTAL ENTERED.
COUNT II. AFFIRMED WITH INSTRUCTIONS ON COURT COSTS ASSESSMENT.
NOTES
[1] The statute, R.S. 14:93.3, designates the offense as "cruelty to the infirmed," an obvious typographical error for "infirm." State v. Walker, 37,493 (La.App. 2 Cir. 8/20/03), 853 So.2d 746, fn. 1, writ recalled, 2003-2871 (La.7/2/04), 877 So.2d 99; Hal Odom Jr., "How Write You Are," 12 The Bar Review 15 (October 2003).
[2] The letter was kept by her supervisor in a separate file.
[3] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.

This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.